Arturo PEREZ, Appellant,

v.

The STATE of Texas, Appellee.

No. 01–99–00574–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

July 27, 2000.

Panel consists of Justices COHEN, WILSON, and PRICE.*

## OPINION

MURRY B. COHEN, Justice.

A jury found appellant guilty of aggravated sexual assault of a child and assessed punishment at life in prison. We reverse and remand.

In July 1998, appellant's daughter told her mother that appellant had sexually abused her, and the offense was reported to police.

Dr. Jim Lukefahr reviewed the medical records compiled by the ABC Center at the University of Texas Medical Branch (UTMB) and testified that, in his medical opinion, the child had injuries consistent with some type of penetrating injury to the anus. At trial, the child testified that appellant had touched her on her "private" in front and her "bottom" in the back with his "private part."

In rebuttal, the State called Trudy Davis as an expert witness. Over defense objection, Davis was allowed to testify about the five stages of "child abuse accommodation syndrome." Davis was not testifying about the complainant in this case, whom she had never met. Instead, she was presented as an expert to interpret generally the theories of Dr. Roland Summit, a pediatric psychiatrist. Because the record does not show that Davis was qualified to testify as an expert regarding Dr. Summit's theories of pediatric psychiatry, we reverse.

### Analysis

In the fourth point of error, appellant contends the trial court erred in admitting the rebuttal testimony of the State's expert witness, Trudy Davis, because there was no scientific basis for the testimony, the State failed to demonstrate the wit-

Thomas W. McQuage, Galveston, for Appellant.

Michael J. Guarino, Richard H. Branson, Galveston, for State.

* The Honorable Frank C. Price, former Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

ness's qualifications to testify, and the testimony was more prejudicial than probative.

In rebuttal, Trudy Davis testified for the State as an expert witness on "child abuse accommodation syndrome."[1] Davis holds a degree in criminal justice and sociology and is a master social worker. She worked as a Child Protective Services (CPS) caseworker and supervisor, as well as an investigator for the Galveston County District Attorney's office, for 18 years before becoming the director of the Advocacy Center for Children, a non-profit organization that works with governmental agencies to evaluate child abuse cases. Based on these qualifications, Davis was allowed to testify about the common reactions of sexually abused children, specifically the nuances of "child abuse accommodation syndrome." She testified her conclusions were based in part on, and also corroborated by, her study of the writings of Dr. Roland Summit, a pediatric psychiatrist who had published in various professional journals.

## A. The Standard of Review

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise. TEX. R. EVID. 702; *Kelly v. State*, 824 S.W.2d 568, 572 (Tex.Crim.App.1992).

■■■ A trial court's determination as to the admissibility of expert testimony is governed by an abuse of discretion standard. *Kelly*, 824 S.W.2d at 574. The burden of establishing the admissibility of an expert's opinion rests on the State because it offered the evidence. *See id.* at 573.

The Court of Criminal Appeals has held that a psychiatrist's expert testimony

about characteristics of child sexual abuse victims may be admissible if it does not comment directly on the complainant's credibility. *Cohn v. State*, 849 S.W.2d 817, 818–820 (Tex.Crim.App.1993). In the present case, however, we are not dealing with a psychiatrist. We are dealing with a non-medical witness's testifying about findings made by a pediatric psychiatrist, Dr. Summit.

## B. The Record

A hearing was held outside the presence of the jury to determine Davis's area of expertise and the basis of her expert opinion. During the hearing, the following testimony occurred:

DEFENSE: Would you tell me what the child abuse accommodation syndrome is?

DAVIS: It's a series of behaviors that were described by Doctor Roland Summit who is a Pediatric Psychiatrist from I believe it's California. I can't remember exactly what state he's from but it's a series of characteristics of a response to child sexual abuse, helplessness, secrecy, accommodation, delayed disclosure and then disclosure.

DEFENSE: Are you a psychiatrist?

DAVIS: No, sir, I am not.

DEFENSE: Are you a physician?

DAVIS: No, I am not.

DEFENSE: Are you a psychologist?

DAVIS: No, I am not.

DEFENSE: Are you an expert in psychology?

DAVIS: No, I wouldn't say so.

DEFENSE: Is this theory that doctor somebody discovered in California a psychological theory?

DAVIS: It's more of an observation of this particular psychiatrist's observations in his treatment of children who

---

1. Davis conceded on cross-examination that she was not describing a "syndrome," which she said was a "misnomer," and that she was

testifying about "a description of behaviors" observed by Dr. Roland Summit. (*See* page 833, below.)

were victims of sexual abuse. Actually the syndrome part of it was really a misnomer. It really is a description of behaviors more than anything.

DEFENSE: It's a description of behaviors. All right. So has this theory or description of behaviors—are you a scientist?

DAVIS: No.

DEFENSE: Do you know how the scientific method works?

DAVIS: To a degree, yes.

DEFENSE: This syndrome which is not a syndrome which was discovered by this gentleman in California—doctor what's his name?

DAVIS: Roland Summit.

DEFENSE: Was he involved in the McMann's or whatever it is pre-school deal in San Diego.

DAVIS: The McMartin?

DEFENSE: The McMartin pre-school deal?

DAVIS: I'm not familiar if he was or not.

DEFENSE: Roland?

DAVIS: Summit, S–U–M–M–I–T, I believe.

DEFENSE: Where did he publish his article where he sets forth this?

DAVIS: It's been published in a wide variety of publications. The Journal of—it's JAMA, the journal of Medical, I forgot what the whole name of it is. But it's the medical association something of that nature and its also been published in a variety of books and other articles.

DEFENSE: Okay. Do you know—I mean your indication is that since it's not a syndrome, it's just his observations of one individual. It has never been subjected to customary scientific examination, has it?

DAVIS: That's correct and the syndrome -

DEFENSE: It's not science?

DAVIS: That's correct. And the fact that the syndrome is a misnomer is by his own statement in a follow up to challenges to his observations.

DEFENSE: So when people challenge his observations, he says they are not science they are just what I saw?

DAVIS: Well, people are challenging his observations through scientific research when it's actually a degree of characteristics that he has seen in his years of treatment of children who are victims of sexual abuse.

DEFENSE: Okay. But it's not science?

DAVIS: Not in his own words, no.

DEFENSE: If it's not science and its not based on your observations, how will we know if it is true? It's just one man's opinion, isn't it?

DAVIS: It's one man's opinion who is specializing in the treatment of children who have been sexually assaulted and he's observing a series of similar characteristics. And not only that, the characteristics that he has observed are other characteristics that have been observed by many treatment providers for a number of years.

* * * * * * *

DEFENSE: Well ma'am, how is this—these different things that this doctor claims to have discovered—he's discovered all this stuff? He discovered minimization, delayed disclosure and what was the other thing in his syndrome?

DAVIS: There's more than three things. There is about five. It's secrecy, helplessness, accommodation, delayed disclosure and disclosure.

DEFENSE: Okay. Does he have a test that he applies to determine whether these things are going to happen?

DAVIS: Based on his literature, no. Again, this is observation of many, many children that he has provided treatment for.

DEFENSE: Okay. So the only way you know about this theory is because you read about it?

DAVIS: I've read about it and I also worked in the field of sexual abuse and observed these same characteristics with children.

DEFENSE: Have you observed these characteristics with [child complainant]?

DAVIS: I don't know [child complainant].

DEFENSE: Okay. How is what you will testify about—which after all common sense would tell us what's different in what you would testify about and what the doctor's syndrome is different from what common sense would tell us about—which are the five factors?

DAVIS: Helplessness, secrecy, disclosure accommodation, delayed disclosure, and disclosure.

DEFENSE: Okay. Helplessness, secrecy, accommodation, what's the other factors?

DAVIS: Delayed disclosure.

DEFENSE: And?

DAVIS: Disclosure.

DEFENSE: Disclosure, okay. Well, if anyone was a victim of a crime—when I was robbed in the street—a man robbed me in the street, hit me over the head with a bottle and took my wallet once. When he hit me over the head, I felt helpless. Initially this was all done in secrecy. He snuck up by me in an alley and hit me over the head—not an alley. It's now a passable street, but back then it was deserted. I accommodated myself to this assault by giving the guy my wallet and, in fact, asked the guy to stop hitting me. I then was in a daze for a period of time and confused before I can go down to actually the tavern around the corner. I eventually stumbled on down there. And then I told the guy in the bar I had been mugged.

and he called the police and the police came out. So common sense would indicate to me that these are the feelings of a person that is the victim of a crime. How is Doctor Roland -

DAVIS: Summit.

DEFENSE: Summit, okay. How is Dr. Roland Summit telling me or the jury anything I don't know already?

DAVIS: Well, I would propose, Mr. Monks, that you do not know what it feels like or what it is like to be a child that has been overtaken by someone that is in a position of authority to do and perform sexual acts on them in secret and convince them not to tell anyone, to keep it a secret for as long as you—we're talking about secrets from anywhere from days to months to years to some adults that still have not disclosed to this day. They are taking advantage of a child in the position of being beneath an adult who has that power over that child. That child has no choice but to accommodate and put up with that person's abuse because often that person is someone that they either care about or has a position of closeness to this child where they feel like they are going to put themselves or their family in jeopardy if they tell. And often children are more comfortable by accommodating or giving in to the abuse because they are looking for it to stop. They think it's going to stop the next time and they also think that maybe by giving in to that abuse that that person they are having that relationship with will love them. And delayed disclosure takes as I said, days, months and years and that's because they're afraid and they have been threatened.

DEFENSE: Right. And you expect me to agree with all those things you just said, right?

DAVIS: No, I really don't expect you to agree. I don't think in these circumstances.

DEFENSE: Aren't they all in fact just the findings of common sense that any person looking upon this situation would know? Any person who evaluates a witness would know?

DAVIS: No.

DEFENSE: About these things?

DAVIS: No, absolutely not. Common sense does not tell you that children are being abused in the dark and in secret. No, people think that children are going to tell immediately, that they are going to have pain, that they are going to hate the person that are sexually abusing them. But no it doesn't happen that way. It is one of the most unusual crimes in all the books. And it's totally different from every other crime in the Texas Penal Code.

DEFENSE: And you can say that even though you don't have any scientific study to show that is true?

DAVIS: That's true. I have 23 years of working in the field, Mr. Monks.

DEFENSE: Okay. So you're just like if they brought a policeman in here and he testified that people who claim they have been hit over the head and had their wallet taken almost always tell the truth? Is there any difference in your testimony?

DAVIS: I think there is.

DEFENSE: You were an investigator for the District Attorney's Office?

DAVIS: Yes, I was.

DEFENSE: And when you were an investigator for the District Attorney's Office, why you found that almost all people who make complaints in criminal cases are truthful? And when you were called by the district attorney you testified that they were telling the truth or the investigation favored the prosecution?

DAVIS: Mr. Monks, you are totally putting words in my mouth that never occurred and that is not true.

DEFENSE: What did you do as an investigator at the District Attorney's Office?

DAVIS: I assisted in the coordination of cases going to trial and I did some expert investigations.

DEFENSE: So you have no scientific basis for this theory?

DAVIS: No, sir, I do not.

DEFENSE: In fact, the—I keep thinking that this Dr. Summit had something to do with the McMay's preschool fiasco?

DAVIS: Well, I don't know.

DEFENSE: You don't know whether he had something to do with McMay's pre-school fiasco or not?

DAVIS: I don't, and a fiasco we could debate on that term too.

DEFENSE: We sure could and maybe we will, but you have no scientific basis for this?

DAVIS: No, sir, I don't.

DEFENSE: All you're going to tell people is that you think that children under these circumstances tell the truth?

DAVIS: No, that's not what I'm going to testify to.

DEFENSE: What are you going to testify to?

DAVIS: I'm testifying to—based on what I assume the questions would be, that there are certain behaviors and characteristics that exist in children who have been victims of sexual abuse.

DEFENSE: You're going to do a profile of the child?

DAVIS: No, not necessarily but some common characteristics of children who have been victimized and how they disclose and why they disclose and the way that they disclose.

DEFENSE: So you're going to come in here and tell the jury based on your experience whether a witness is telling the truth?

DAVIS: No, I'm not.

DEFENSE: You're going to tell them that a person who says in this, this, this, this, and this is telling the truth?

DAVIS: No, I'm not.

DEFENSE: Well then what's the purpose of your being here? How are you going to help them? What are you going to help the jury do?

DAVIS: The only way I know to answer that is maybe you need to ask Mr. Reed [the prosecutor].

DEFENSE: Okay. You don't know how your testimony is going to help the jury?

DAVIS: It may or may not help them.

On redirect, Davis stated she had testified "to these very matters as a rebuttal expert witness for the State" on 10 to 12 occasions. She also stated she had personally observed such characteristics in sexually abused children:

PROSECUTOR: And what is your understanding of what you're going to be testifying about?

DAVIS: To common characteristics and behaviors that are seen in children and in situations regarding child sexual abuse.

PROSECUTOR: And have you had an opportunity to view these common characteristics and behaviors in the 18 years you worked for CPS and over a thousand child sexual abuse investigations you have been involved with.

DAVIS: Yes.

On re-cross, appellant's attorney continued examining Davis's background qualifications for testifying about Dr. Summit's findings.

DEFENSE: You said you don't know how your testimony is going to help the jury and what you're testifying to is not science.

DAVIS: It is not science and I'm saying that it could either help or not help. I don't know. Every juror is going to listen to what I have to say and I hope it will help them.

DEFENSE: But it's not a syndrome. Its common characteristics, but you've not observed those common characteristics in a scientific way. You have not kept a diary of those common characteristics, have you?

DAVIS: Not a written diary.

DEFENSE: Right. You have not submitted the people who supposedly have those common characteristics to peer testing. You have not sent those people over to somebody else to determine whether they have this so-called syndrome, have you.

DAVIS: No.

DEFENSE: Have you ever written an article about this?

DAVIS: I've written articles about child sexual abuse.

DEFENSE: Have you ever written an article about this syndrome?

DAVIS: No.

## C. Applying the Law to the Facts

It is our view that Davis admitted her lack of scientific expertise to render an opinion regarding Dr. Summit's theory. Thus, the trial court erred by allowing Davis to testify as an expert concerning Dr. Summit's theory.

■ In determining Davis's qualifications as an expert witness and the scientific basis for her opinions, we follow *Kelly v. State*, 824 S.W.2d at 573. The *Kelly* factors include (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community; (2) the qualifications of the expert testifying; (3) the existence of literature supporting or reflecting the underlying scientific theory and technique; (4) the technique's potential rate of error; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory can be explained to the court; and (7) the experience and skill of the person who

applied the technique on the occasion in question. *Id.*

To determine whether the trial court abused its discretion in allowing Davis to testify concerning Dr. Summit's "child abuse accommodation syndrome," we will review the record in light of the *Kelly* factors.

#### (1) Extent to Which the Underlying Scientific Theory and Technique Are Accepted as Valid by the Relevant Scientific Community

Davis testified that Dr. Summit's findings had never been subjected to customary scientific examination. She testified that "in his [Dr. Summit's] own words" the findings were not "science" and were not a "syndrome," which Dr. Summit conceded "by his own statement in a follow up to challenges to his observations.". Furthermore, Davis acknowledged that "people are challenging his observations through scientific research when it's actually a degree of characteristics that he has seen in his years of treatment of children who are victims of sexual abuse." There was no evidence identifying a "relevant scientific community" and stating that it accepted Dr. Summit's findings. We conclude that this factor weighs against allowing Davis to testify about Dr. Summit's theory.

#### (2) The Qualifications of the Expert Testifying

Davis is not a psychiatrist, psychologist, scientist, or physician, and testified she understood the "scientific method" only "to a degree." She had never written an article about "child abuse accommodation syndrome," although she had written some articles about child sexual abuse. The record does not show where or when these articles were published or what topics they covered.

Davis, however, had been a CPS caseworker and supervisor, as well as an investigator for the Galveston County District Attorney's office, for 18 years before becoming the director of the Advocacy Center for Children, a non-profit organization that works with governmental agencies to evaluate child abuse cases. She testified she has taken part in more than 1,000 child sexual abuse investigations. She also holds a bachelor's degree in criminal justice and sociology and is a master social worker.

We conclude that this evidence is insufficient to show that Davis was qualified to interpret and apply the theory of an expert child psychiatrist whose work was admittedly being challenged and was not shown to have been widely accepted by the psychiatrist's peers. (*See* factor 1, above.)

#### (3) The Existence of Literature Supporting or Reflectingthe Underlying Scientific Theory and Technique

Other than stating that Dr. Summit's findings had been published in a "wide variety of publications," including "JAMA," the record is silent concerning the existence of literature that supports or reflects the underlying theory. None of the publications were identified more specifically than this. Davis admitted that Dr. Summit's peers were criticizing his findings. ("People are· challenging his observations through scientific research....") Considering this evidence, along with the absence of acceptance of Dr. Summit's theories by the "relevant scientific community" (*see* factor 1, above), we conclude this factor weighs against allowing Davis to testify about Dr. Summit's theory.

#### (4) The Technique's Potential Rate of Error

The record is silent concerning this factor. Davis acknowledged that Dr. Summit did not have a test he applied to determine whether the elements of his child abuse accommodation syndrome existed. Davis also admitted she had no scientific basis for "this theory." We conclude this factor weighs against allowing Davis to testify about Dr. Summit's theory.

### (5) The Availability of Other Experts to Test and Evaluate the Technique

The record is silent as to this factor. We conclude this factor weighs against allowing Davis to testify about Dr. Summit's theory.

### (6) The Clarity With Which the Underlying TheoryCan Be Explained to the Court

Davis was able to explain Dr. Summit's theory. Davis explained the five factors that make up the "child abuse accommodation syndrome"—helplessness, secrecy, accommodation, disclosure, and delayed disclosure—and explained how these factors may manifest themselves in the actions of a sexually abused child. We conclude this factor favors allowing Davis to testify about Dr. Summit's theory.

### (7) The Experience and Skill of the Person Who Appliedthe Technique on the Occasion in Question

Although Davis was shown to be an experienced child sexual abuse investigator, the record contains no evidence demonstrating her ability to interpret and apply psychiatric findings. Therefore, this factor weighs against allowing Davis to testify about Dr. Summit's theory.

### D. Conclusion

█ After carefully considering the record before us using the *Kelly* factors, we hold that the trial court abused its discretion by allowing Davis to testify concerning the "child abuse accommodation syndrome" theory of Dr. Roland Summit. Although Davis has substantial experience in the field of child sexual abuse investigation, she is not an expert in the field of psychology, psychiatry, medicine, or science. Furthermore, the record is weak regarding the acceptance of Dr. Summit's writings in the relevant scientific community and the existence of literature supporting Dr. Summit's findings.

Davis testified about the behavior of sexually abused children based partly on Dr. Summit's articles and partly on her own personal experience. The testimony about Dr. Summit's theory was error because it allowed Davis to increase the credibility of her own expert testimony by adding to it the veneer of Dr. Summit's psychiatric expertise.[2] Because we have found the trial court abused its discretion by allowing Davis to testify concerning Dr. Summit's findings, we review the record for harm.

### E. Harm

█ The error is non-constitutional; therefore, we evaluate it under TEX.R.APP. P. 44.2(b) and disregard it if it did not affect appellant's substantial rights. *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim.App.1998); *King v. State*, 953 S.W.2d 266, 271 (Tex.Crim.App.1997).

Error occurred in the following instances when Davis testified before the jury:

PROSECUTOR: Ms. Davis, what is Child Abuse Accommodation Syndrome?

DEFENSE: Your Honor, I am going to object to that. That's asking for expert information that Ms. Davis is not qualified to give an opinion.

JUDGE: Overrule your objection.

DAVIS: The Child Abuse Accommodation Syndrome is a description of behaviors and characteristics that were developed by Dr. Roland Summit who is a psychiatrist and he has worked with children who are victims of child sexual abuse.

PROSECUTOR: And do you know when this first came about or—that's the first question: When did this first come about to your knowledge?

---

2. We express no opinion regarding Davis's qualifications to testify as an expert regarding her own observations and opinions, without reference to the opinions, observations, and theories of Dr. Summit.

DAVIS: The late 70's early 80's.

PROSECUTOR: And explain it to the jury, what is it?

DAVIS: Basically it's in this psychiatrist's treatment of child sexual abuse. He began to see patterns in the children.

DEFENSE: Your Honor, I object. That's hearsay.

JUDGE: She's—overrule your objection.

DAVIS: He saw patterns of behaviors and characteristics in the disclosure and occurrence of child sexual abuse.

PROSECUTOR: And can you—what are the patterns of behavior? Can you describe them or are they set in any categories at all?

DAVIS: Yes.

PROSECUTOR: Can you describe that for the jury?

DAVIS: Yes. The first is helplessness, the second is secrecy, accommodation, delayed disclosure and disclosure.

PROSECUTOR: Can you just go through one at a time. Can you explain helplessness?

DAVIS: Basically it's the fact that a child is being in a subordinate position with an adult is put in the position where they feel ... (objection omitted)

DAVIS:—where the child because of their position of subordination to adults, they are in the position of helplessness toward any kind of overtures of sexual behavior toward them the secrecy aspects of it is that most sexual abuse is—most sexual abuse that occurs to children is secret. Its in the dark often. It is in places that is not easily observed by anyone, although it can happen with someone in the next room. But it's a secret pact between the person that's conducting, that is doing the sexual abuse and that child. It becomes a secret because of the power that person has over that child. Often threats are used from a variety of someone will be killed in your family, people won't believe you, you'll go to jail because that person that's doing the abuse is also someone that is often a close—has a close relationship with the child.

The accommodation part of it is when a child, initially a child gives in to those sexual activities but over time when they think its going to stop and it doesn't stop they decide that it is better to give in to it than to fight it. Maybe the next time it won't happen. Maybe this person will love me if I subject myself to this and if I don't tell.

Delayed disclosure is related to all the characteristics prior to that. The fact that the child is in that subordinate position with someone that they care about or their home life and their family's livelihood is threatened so they don't tell from anywhere from days to months to years because often what also happens is the sexual abuse is—it grows over time. It goes from the minimal type of abuse which could be nudity or exposure to then penetration. And then disclosure is when the child eventually does disclose, either accidentally or intentionally. Either pregnancy might occur where the disclosure takes place or the child is acting out in some way sexually and someone asked them about that behavior. So the disclosure can happen in those two ways.

In closing, the prosecutor argued:

Well, you heard Ms. Davis talk about partial outcry. Does that make sense? Remember we're talking about a nine-year-old child and we're talking about a person doing stuff to a nine-year-old child who is the most—who should be one of the top two cherished people in that child's life, the child's natural father. Is that going to be hard for a child to say something about it? Use your common sense ladies and gentlemen. You heard [child complainant]

testify, "You better not tell anybody." It's very common, very common that these kind of things are said to keep a victim—to keep a sexually abused child quiet because once the perpetrator does it, he's got to keep them quiet or we end up here. Is that logical? Does that make sense to you?

Later in his closing, the prosecutor specifically directed the jury's attention to Davis's testimony about Dr. Summit's findings: "Remember what Ms. Davis said, helplessness, secrecy, accommodation, delayed disclosure to disclosure. Does all that make sense to you about the reaction of this child [child complainant]?" These excerpts show the source and the nature of the error, as well as the extent to which the State emphasized the error. *Cf. Harris v. State,* 790 S.W.2d 568, 587–88 (Tex. Crim.App.1989).

Defense counsel dedicated roughly 85% of his closing argument to attacking the credibility of the child or criticizing the State's use of Ms. Davis as an expert witness. For example:

I went home last night and I thought about this, about my argument. And I said to myself, hey man, they don't get this up the hill, not beyond a reasonable doubt. Many inconsistencies in the girl's story and today they attempt to further their testimony by bringing in an expert who is not a scientist or psychologist. You had a former investigator for the District Attorney's Office. Talk about desperation. Talk about desperation to try and make a case. A former investigator for the District Attorney's Office and she gives you a syndrome that doesn't fit this case.

They talk about accommodation. Well, there are only two occasions. There's no accommodation. There is no evidence of any kind of odd relationship. There is a "You're going to get in trouble." Well, maybe he said to her in one of the versions maybe according to the State two years before. Mr. Perez has not lived with the child. This is impor-

tant. He visits with the child from time to time. He's not like married whose got some sort of fiancé who lives with the child now and who has lived with the child for some unknown period of time. Arturo Perez does not live with the child. Is not in constant contact with the child. Is not in a position to influence or put the child in fear. The child is not afraid of him.

The child is afraid of me. Wonderful testimony—when you think back about [complainant's] testimony when [complainant] is answering Mr. Reed's questions, everything is fine. When she answers my questions, she's got to cry. Why? I didn't exactly conduct a rip roaring burning fire blasting cross-examination of the child. I'm just trying to get at what happened. And the child is afraid to say what happened, can't say what happened. No, the child can say what happened but won't say what happened. What happened is this is the story, this is a little tale just like the story of the wrist watch that got out of control. And, now, the State wants to slide home with their experts and the child. And the only separated testimony they want to slide home on is the sorry excuse that she's only eight years old and therefore you should not extend to Mr. Perez the same rights that every American has the absolute right to expect when they are brought before court for a traffic ticket or for murder.

This shows the significant effect of the error and the weight the jury would likely have placed upon it. *Cf. Harris,* 790 S.W.2d at 588.

After defense counsel's closing argument, the prosecutor relied further on Davis's testimony concerning Dr. Summit's findings:

So, therefore, if you take the logical implication of that argument so every child is the same, A and B every child immediately discloses sexual abuse as soon as it happens as soon as they leave the room where it happened. Every

child in the world discloses sexual abuse. Does that make sense to you? Use your common sense. We know based on common sense—and Ms. Davis testified children don't disclose for a variety of reasons and they wait days, months, years. A few sentences later, the prosecutor argued, "Do we know these things happen? Sure they do. You heard Ms. Davis talk about delayed disclosure. It happens all the time." This further shows the effect of the error and the State's emphasis of it.

Davis testified she was a frequent witness "to these very matters" in similar cases. Consequently, declaring this error to be harmless would "encourage the State to repeat it with impunity." *Harris*, 790 S.W.2d at 587.

Considering the record as a whole, we conclude that the evidence against appellant was not so overwhelming as to justify a conclusion that Davis's testimony concerning Dr. Summit's findings did not affect the verdict. When first questioned by her mother, the child initially denied she had been abused by appellant. The child's account of the facts of the instances of abuse changed several times in the course of being communicated to her mother, to the police, and to the jury. There was both scientific and nonscientific evidence that either weakened the State's evidence or favored appellant. Dr. Lukefahr explained that the anal skin tags or folds he observed on the child raised a concern about sexual injury, but it did not conclusively establish the existence of such an injury. Such irregularities, he testified, are observed in about 11% of children who have not been abused. Further, appellant's mother testified, contrary to the State's evidence of how this crime was committed, that appellant and the child had never stayed in her home overnight at the same time after appellant and the child's mother divorced. In his closing, appellant's attorney strongly contested the child's credibility.

Davis's testimony about Dr. Summit's theory was specifically directed at explaining the complainant's inconsistent disclosures, her delayed disclosures, and her incomplete disclosures, which, according to Davis (and, through Davis, Dr. Summit) were normal among sexually abused children. The entire trial hinged on the complainant's credibility, which was seriously challenged. Davis's testimony supported the child's credibility by explaining away the significance of her denials, delays, and inconsistencies. In doing so, Davis used Dr. Summit's theories to put an undeserved gloss of medical and psychiatric expertise on her own opinion.

We conclude that Davis's testimony significantly strengthened the State's case, and that Davis improperly and significantly strengthened her own testimony by giving it the apparent endorsement of a physician and expert child psychiatrist, Dr. Summit. Under this record, we conclude that appellant's substantial rights were affected. TEX.R.APP. P. 44.2(b).

We sustain the fourth point of error.

We reverse and remand for a new trial.