Opinion filed June 3, 2010

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh
Court of Appeals

                                                                 ____________

 

                                                           No. 11-08-00069-CR 

                                                     __________

 

                                   DANIEL
RAY MORRIS, Appellant

 

                                                             V.

 

                                       STATE
OF TEXAS, Appellee

 



 

                                          On
Appeal from the 91st District Court 

 

                                                       Eastland
County, Texas

 

                                             Trial
Court Cause No. CR-04-20,480

 



 

                                               M
E M O R A N D U M   O P I N I O N

 

This court=s
former opinion and judgment dated February 25, 2010, are withdrawn, and this
court=s opinion and
judgment dated June 3, 2010, are substituted therefor.  On this same date, we
overrule Daniel Ray Morris=s
motion for rehearing.








By presenting three points of asserted
error, appellant Daniel Ray Morris challenges his conviction of indecency with
a child and the resulting jury-assessed punishment of ten years confinement in
the Institutional Division of the Texas Department of Criminal Justice and a
fine of $10,000.  Imposition of the confinement was suspended, and appellant
was placed on community supervision for a period of ten years.  In his three
points, appellant contends the trial court erred (1) in allowing a police
officer to testify that appellant was guilty, (2) in allowing expert testimony
from a Texas Ranger that appellant was guilty and not telling the whole truth,
and (3) in allowing Texas Ranger David Hullum to testify as an expert witness
about AMethodology@ and AGrooming.@  Disagreeing that
reversible error exists, we affirm the judgment of the trial court.

Because they are so closely related, we will
discuss appellant=s
first two points together.  In his first point, appellant contends the trial
court reversibly erred in permitting a deputy sheriff to testify, over
objection, that in his opinion, based upon his training and experience as well
as his investigation and the investigation by the other agencies involved,
appellant engaged in sexual contact with the victim with the intent to arouse,
satisfy, or gratify his sexual desires.  In his second point, he complains of
the trial court=s
action in allowing Texas Ranger Hullum to give an affirmative answer to such a
question; he places his primary reliance upon the court=s decision in Boyde v. State, 513
S.W.2d 588 (Tex. Crim. App. 1974).  His reliance on Boyde requires us to
discuss that case in some detail.

The portion of the Boyde opinion to
which appellant refers is that in which the court refers to a question asked of
a State=s witness that
queried whether the witness knew of any evidence in the case that would tend to
exonerate or show that the defendant was not guilty of the offense charged. 
The defense objection to the question was promptly sustained, and the jury was
instructed to disregard it.  Id. at 590.  In considering whether
reversal was required, the court noted the general rule that a criminal
conviction is seldom reversed because an improper question was asked.  However,
it went on to emphasize and discuss that the trial record showed the prosecutor
asked numerous other questions of a similar nature to which objections were
sustained and the jury instructed to disregard.  En route to reversing the
conviction, the court noted that the prosecutor  pursued Aa course of repeatedly
attempting to place matters before the jury which were clearly impermissible@ and which Acould have served no
purpose other than to inflame and prejudice the minds of the jurors.@  Id. at 593.  It
chose to explicate the necessity for reversal by stating that A[s]uch prosecutorial
misconduct cannot be labeled harmless and requires the reversal of a conviction
of a brutal and senseless murder.@ 
Id. at 593.  Thus, the case was reversed because of the totality of the
repeated prosecutorial misconduct during the trial, not the mere asking of the
guilt opinion questions.








In the instant case, however, the objections
were not sustained, and the witnesses were allowed to answer.  We agree that,
in each instance, the questions asked and the answers given may have been
tantamount to expressing an opinion as to appellant=s guilt.  Assuming arguendo that those
questions and the answers were improperly given, Texas Rule of Appellate
Procedure 44.2(b) requires that we conduct a harm analysis in light of the
whole record.  Tex. R. App. P.
44.2(b).  In a case such as this one that involves a nonconstitutional error,
we disregard such errors unless they affect an appellant=s substantial rights.  Rich v. State,
160 S.W.3d 575, 577 (Tex. Crim. App. 2005).  A substantial right is one that
has a substantial and injurious effect or influence in determining the jury=s verdict.  Id.  A
substantial right is not affected by the erroneous admission of evidence if,
after examination of the record as a whole, the reviewing court has a fair
assurance that the error did not influence the jury or had but a slight
effect.  Solomon v. State, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001). 
In assessing the likelihood that the jury=s
decision was adversely affected, the appellate court should consider everything
in the record, including any testimony or physical evidence admitted for the
jury=s consideration, the
nature of the evidence supporting the verdict, and the character of the alleged
error and how it might be considered in connection with other evidence in the
case.  Motilla v. State, 78 S.W.3d 352, 355 (Tex. Crim. App.
2002).  Our review requires a recitation of relevant evidence in somewhat
exhaustive detail.

The State=s
first witness was J.R.M., appellant=s
minor stepson and the victim.  The first child protective service worker
involved in this case was young, female, and attractive, and J.R.M. was
reluctant to discuss the incidents with appellant in detail with her.  However,
he said he was now ready to discuss the incidents before the jury.  Appellant
first met J.R.M. when he was eleven years old and appellant was dating his
mother.  J.R.M. thought he had a good relationship with appellant, and they
would go to the park, rollerblade, and ride mountain bikes.  They would discuss
sexual matters, including sex and masturbation.  Appellant told J.R.M. that it
was Aguy talk@ between the two of them
and that he should not mention it to his mother.








Later, appellant began giving J.R.M. back
rubs and would say that his mother had given him back rubs when he was a
child.  Later, appellant and J.R.M.=s
mother married, and appellant continued to give him back rubs.  Appellant began
to tell J.R.M. that he had concerns about the boy=s
mother because she would come in late at night and want to have sex and
appellant did not want to.  Appellant slept in J.R.M.=s bed on those nights when the mother had been
drinking, even though there were other places to sleep such as the living
room.  J.R.M. said that his mother became concerned about the time that he and
appellant were spending together and it made J.R.M. angry.

J.R.M. said that he and appellant would talk
just A[s]ex in
general, also a lot of times  masturbation@
and that appellant would ask him questions about his masturbation that
embarrassed him.  Appellant took him to a show in Abilene entitled AMinority Report,@ and on the way home,
appellant asked him if he had masturbated yet.  Appellant also told him that he
and his mother=s
sister, Debra Roper, did not get along and that she thought appellant was gay
and was trying to turn J.R.M. gay.  J.R.M. overheard appellant and Debra having
some kind of discussion.  Later, appellant told him that Debra thought
appellant spent too much time in his room at night and that he was trying to
turn J.R.M. gay.

At some point in time, J.R.M. got a
full-size bed, and his mother and appellant would occasionally come in to tuck
him in bed.  When appellant did so, they would talk about masturbation and
sex.  Appellant would rub J.R.M.=s
back; and, when he did so, he wore briefs or shorts and the back rubs would
last fifteen or twenty minutes.  Appellant would pull his shorts off and have
J.R.M. pull his briefs down so they could have skin-to-skin contact.  J.R.M.
also said that, in addition to rubbing his back, appellant would also rub his
buttocks.  At first, appellant would stay thirty minutes to an hour, but,
eventually, he would stay the whole night.  J.R.M. said he and appellant
measured each other=s
erect penises on one occasion.  J.R.M. said that appellant stayed with him Adefinitely every night@ and that appellant would
want to cuddle.

J.R.M. described another occasion when his
mother caught appellant giving him a back rub as they drove back from a hay
trip in appellant=s
truck.  J.R.M. had stripped down to his underwear and was lying with his head
in appellant=s lap
while appellant rubbed J.R.M.=s
back with one hand and drove with the other.  Appellant had also told him how
to find pornography on the internet but told him not to tell his mother or he
would get in trouble.  When J.R.M. was asked by the prosecutor if he had ever
seen appellant aroused during the back rubs, J.R.M. replied that appellant had
become aroused many times.








In the month of May 2003, appellant
continued to sleep in J.R.M.=s
bed and to give and receive back rubs.  During those times, appellant would
reach inside J.R.M.=s
underwear and touch his penis.  J.R.M. also testified about a trip he made with
appellant to Rainbow, Texas, during which they stayed in an RV trailer.  He slept
in the master bedroom with appellant, and appellant touched his penis. J.R.M.
also read aloud a letter that appellant wrote him after his mother left
appellant and took the children.  In the letter, appellant told J.R.M. that he
was the best son, and he predicted that J.R.M.=s
father would try to say that J.R.M. and appellant had a sexual relationship.

Under cross-examination, J.R.M. said that,
although he had other friends, he never told any of them about the incidents
with appellant.  Contrary to his trial testimony that appellant was unclothed
and that appellant had touched him in a joking manner, J.R.M. also admitted
that, when questioned by the CPS caseworker, he stated that appellant was
wearing clothes at the time of all the incidents.

J.R.M.=s
mother also testified.  She averred that, during her four-year marriage to
appellant, they  probably had sex only eight or nine times.  She was disturbed
by the relationship between appellant and J.R.M.  She had observed appellant
rubbing J.R.M.=s
nipple and his inner thigh.  J.R.M. had also visited a gay website, and she had
overheard appellant tell J.R.M. that he had not been very Alovey dovey.@  Appellant slept in J.R.M.=s bed increasingly over
time.  Ultimately, she decided to leave without telling appellant of her
decision.

Under cross-examination, she admitted she
had been a little concerned that J.R.M. would want to live with appellant after
the separation and divorce.  Even though she told J.R.M. that she thought
something was going on between him and appellant, she allowed him to go on
overnight trips with appellant.

Roper was the State=s next witness.  She opined that J.R.M. was a
happy, fun-loving child before her sister married appellant.  After that,
J.R.M. did not want to have anything to do with her family.  She also thought
that J.R.M.=s mother
changed and lost self-esteem after the marriage.  She also referred to a
weekend in the fall of 2000 when appellant, J.R.M., and J.R.M.=s mother were staying with
the Roper=s family. 
As her sister was taking a shower, Roper walked past the bedroom in which
appellant and J.R.M. were lying on the bed; they were both in their underwear. 
J.R.M. was lying on his back, and appellant was on his side next to J.R.M.=s head rubbing J.R.M.=s thigh.








The State then called Lanny Boone, a deputy
sheriff with the Johnson County Sheriff=s
Office.  He began an investigation of the allegations giving rise to this
prosecution when J.R.M. was fifteen and appellant was thirty-four.  When
interviewed by him, he averred, appellant admitted that he had touched J.R.M.=s penis through his
clothing and underneath his clothing and that they had skin-to-skin contact. 
Appellant admitted that J.R.M. had touched appellant=s penis but contended that the touching was
not sexual in nature but, rather, was Ahorseplay.@  Based upon his training
and experience and upon his investigation, Deputy Boone thought that describing
the touching as Ahorseplay@ was  inconsistent with the
facts and that appellant was not Aforthcoming@ when he made his
statement.

The State next called Texas Ranger David
Hullum who was director of security for Frac Tech Services.  Ranger Hullum had
been employed in law enforcement some twenty-nine years, including nine years
as a Texas Ranger in the Eastland area.  He also had over 3,500 training hours
in connection with law enforcement.  He had participated in several hundred
sexual offense case investigations, at least a third of which involved child
victims.  He averred that he was the primary investigator or played a
significant role in at least seventy-five of those cases.  He also had
specialized training regarding sexual offenses against children.  He was a
member of the cold case review committee that investigated unsolved murders and
sexual assaults.

Ranger Hullum was queried by the prosecutor
as to whether he had reviewed the materials in the underlying case and replied
that he had done so.  He was then queried whether he had an opinion as to
whether appellant had engaged in sexual contact with J.R.M. with the intent to
arouse or gratify his sexual desires.  Over objection, he opined that appellant
had done so.  He also opined that, although he himself had engaged in horseplay
as a coach, he had never seen any coach or anyone grab another player=s crotch or penis.  When
queried as to why he believed the activity between appellant and J.R.M. was not
horseplay, he replied that their activity involved sexual contact, repeated
contact, and contact made in secret.

He defined Amethodology@ as the method of operation
or how a particular crime is committed.  He defined Agrooming@
as an attempt to put the victim in a receptive frame of mind to comply with
what the offender wants the victim to do.  In his opinion, going into a child=s bedroom and initially spending
ten to fifteen minutes, then finally spending the night, was an example of
grooming.








In Ranger Hullum=s view, appellant=s visits to J.R.M.=s bedroom and the progressive nature of his
overnight visits were significant and sufficient to constitute Agrooming@ or one-on-one intimate
time with J.R.M.   When appellant gave J.R.M. back rubs, he was desensitizing
him by initially touching him in a neutral area where the child did not believe
that it was wrong to touch and then progressing to  more sensitive areas. 
Based upon his training, Ranger Hullum said, it was not unusual for a sexually
abused child to believe that he or she was being joked with when being touched
in a sensitive area.  The sexual offender disguises sexual foreplay as Ahorseplay@ in order to obtain sexual
contact.  Sexual banter and relating prior sexual experiences to a child are
also common ways in which to desensitize or Agroom@ a child.  Grooming could
also involve measuring a child=s
penis because it would be another way the offender could justify having his
hand in that area of a child=s
body.  

Ranger Hullum also opined that one way
sexual offenders would justify their sexual contact with children was to
justify it under the guise of sex education.  Moreover, he said, a sexual
offender discourages family relationships and tries to isolate the child, even
to the extent of driving a wedge between a child and his mother.  He also
opined that male-on-male sexual abuse is the most underreported type because
the child is embarrassed and is afraid that he will be perceived as
homosexual.  Thus, it would not be unusual for a child victim in the eighth
grade not to tell his other friends about the abuse.

When cross-examined, Ranger Hullum gave
general answers to his qualifications and could not recall the specific titles
of his instructors or books or articles that they may have written.  He had not
actually interviewed appellant but based his opinions on documents that had
been produced by the State.

After the State rested, appellant began his
presentation by calling Jason Shelton.  Shelton was one of J.R.M.=s schoolmates and friends,
and he played football with J.R.M. in the ninth grade.  He also had hauled hay
for appellant after the incident charged in the indictment.  In July of 2003,
Shelton related, he went to a Future Farmers of America convention with J.R.M.
and gave him a letter from appellant that he, Shelton, had read before he gave
it to him.  J.R.M. had agreed to sell Shelton a four-wheel vehicle but wanted
to back out of the agreement after he learned that Shelton was hauling hay for
appellant.

Under cross-examination, Shelton said that,
when appellant found out about the accusations against appellant, he went to
Shelton=s house and
told him that he had given J.R.M. back rubs and had grabbed J.R.M.=s penis once.  Appellant
told him that he had purchased pornographic magazines for J.R.M. on the
condition that J.R.M. not have sexual relations until he reached a certain
age.  Appellant also had told the witness that he preferred to sleep with
J.R.M. rather than his wife because she was always drunk.








Appellant=s
next witness was Joe Jarvis whose son played football with J.R.M.  He averred
that he had known appellant for seven years.  Jarvis went to the same church as
appellant=s parents. 
He thought that appellant had a good reputation, and he would have trusted
appellant with his son without qualification.

Brent West, a coach, also testified for
appellant.  He thought J.R.M. was a great kid and a Apretty good football player.@  He did not think that
J.R.M. had any kind of psychological problems or low self-esteem.  As a coach,
he said that locker-room horseplay would include players grabbing each other=s crotches outside their
clothing.  He thought appellant was an involved parent.

Bill Sandlin, a junior high and high school
principal, testified that he had a business relationship with appellant; they
bought and sold hay.  He thought that appellant and J.R.M. had a good
relationship.

Dennis Milton, the superintendent and
mechanical coordinator for Sky High of Fort Worth, testified that he had known
appellant since junior high school and that appellant had never shown any kind
of sexual interest in anyone other than females.  Under cross-examination, he
noted that J.R.M.=s
mother had been drinking every time he visited.  He also said that appellant
told him that he left his marital bed because his wife smelled like alcohol and
cigarette smoke.  He averred that he had told appellant that, if anything
happened to him, he would want him to raise his boys.  He also averred that
appellant had told him that he, appellant, had been accused of, but denied,
touching J.R.M.=s penis. 
Appellant told him that he had rubbed J.R.M.=s
sore back after J.R.M. had practiced football.

Darren Wade Morris, appellant=s older brother, testified
he observed that appellant=s
wife drank every evening, becoming Apretty
well blitzed@ by the
end of the evening.  When they were younger, appellant dated girls, and Darren
never knew appellant to be attracted to the male sex.  After he was indicted,
appellant told him that he slept in J.R.M.=s
bed because his wife smelled of alcohol and cigarettes.  Appellant did admit to
him that he accidently grabbed J.R.M.=s
crotch but said that it was during horseplay.








Robert Dunning and Craig Dodson also
testified for the defense.  Dunning said he had known appellant for about five
years and believed that appellant and J.R.M. had a very normal relationship. 
Dodson, a deputy sheriff for Somervell County, opined that he had known
appellant since the sixth grade and that appellant had never shown any
inclination toward the male sex.  He said that appellant told him he had
touched J.R.M.=s
genitals but that it was horseplay.

J.R.M. then took the stand.  He admitted
that in 2005, when interviewed by the district attorney, he spoke about the
touching of his genital area but described it as Ahorseplay.@  He believed his mother
had a drinking problem, and a poem he had written inspired by his mother=s problem was admitted into
evidence.  He denied that he had told anyone that his biological father was
going to buy him a jeep for testifying against appellant.  He did acknowledge
that he had told the CPS worker that he had touched appellant=s genitals but that he was
not forced to and the contact was a result of horseplay and in a joking manner.

After J.R.M.=s
testimony, appellant recalled Shelton who averred that J.R.M. told him his
father would buy J.R.M. a jeep if he would testify against appellant.

Appellant then took the stand.  He testified
that he had met J.R.M.=s
mother through a friend and that she introduced him to a nighttime routine of
giving her children back rubs when she put them to bed.  She eventually asked
appellant to assist her in doing so.  He had expressed concern to her because
she sometimes had allowed J.R.M. and his sister to run around partially
clothed.  He said he discovered his wife=s
drinking problem about halfway through their marriage, and he ultimately did
not want to sleep with her because she would come in late reeking of beer and
cigarettes and wanting to talk and would wake him up.  He thought that he and
his wife had a regular sexual relationship.

When J.R.M., in a joking manner, asked
appellant about his sexual relationship with his wife,  appellant said he
responded in kind but did not go into detail.  J.R.M.=s mother had signed a permission slip for
J.R.M. to take sex education at school, but she did not want to talk about it
and, instead, asked appellant to do so.  Appellant averred that he had tried to
do so to the best of his ability.  He admitted that he had purchased a Playboy
magazine and some others after J.R.M. promised to abstain from sex through high
school.  He denied that he had purchased any adult videos for J.R.M. although
the boy requested him to do so.

Appellant said that their house had settled
and that the door to J.R.M.=s
room would not close completely.  He said that, in the several months before he
and J.R.M.=s mother
separated, he occasionally slept in J.R.M.=s
bedroom because his wife would be drinking and would come into their bedroom
during the night and wake him up.








Appellant said that, on New Year=s Eve of 2000, he and his
wife gave a party during which everyone got fairly intoxicated.  Roper attended
the party.  Roper saw him coming out of J.R.M.=s
bedroom after he had told J.R.M. good night, and she asked appellant whether
what he was doing was Agoing
to turn him.@  When
appellant asked Roper if she was Aaccusing
[him] of turning [his] son gay,@
he received the reply, AHe=s not your son.@  That led to an argument
between appellant, his wife, and her sister.

Appellant then described the back rubs that
he and his wife gave the children at bedtime.  He said that J.R.M. would
occasionally rub their backs.  He denied ever touching J.R.M.=s testicles, pulling J.R.M.=s underwear down, having
J.R.M. touch his penis, or reaching an erection when he gave J.R.M. a back
rub.  Problems arose during his marriage to J.R.M.=s mother, and J.R.M. said that he would want
to live with appellant rather than his father or mother.

Appellant averred that the first time he
learned of the allegations against him was in a telephone conversation with his
wife after she left him.  At that time, she told appellant that he and J.R.M.
had an unhealthy relationship.  He next received a message from Deputy Boone. 
Deputy Boone asked him to come in and talk to him because appellant=s ex-wife had filed a
complaint against him.  In the course of the conversation with Deputy Boone,
appellant denied touching J.R.M.=s
penis but admitted that he might have grabbed the boy=s crotch during horseplay.  He asserted that
he had never been accused of a felony before the instant charges and denied
that he had taught J.R.M. how to find free pornographic pages on the internet.

Appellant did remember that his wife had, on
one occasion, found some pornographic web sites on the computer and questioned
him as to whether he had been looking at them.  He denied having done so but
said that he had caught J.R.M. using the computer at the time the pornographic
material would have been obtained and that J.R.M. had admitted to going to such
a web site.








When cross-examined, appellant admitted that
J.R.M. slept in his bed most of the nights before they would leave on trips to
buy or sell hay.  In cross-examining appellant, the prosecutor then used a
poster with the elements of the charge against appellant shown on it. 
Appellant admitted that he had touched J.R.M.=s
genitals two or three times but said he only did so as a result of horseplay. 
When queried by the prosecutor if he was Alovey
dovey@ with J.R.M.,
appellant said he did not use that term and did not believe he ever used that
term.  He said that, when he and J.R.M. engaged in horseplay, they were not in
bed.  He also averred that, when he and J.R.M. checked into a motel room on
their hay trips, they got rooms with full-size beds.  He stated that J.R.M.=s allegations of sexual
contact were lies and that J.R.M. had had no choice in making them.

On redirect examination by his counsel,
appellant denied that his wife had made any complaints about the time he spent
with J.R.M.  He also denied that he and J.R.M. had ever measured each other=s penises although J.R.M.
had told him in a joking manner that he had measured his own.  He denied that
he had ever engaged in secret horseplay with J.R.M.  He also testified that,
when they engaged in horseplay, he had no intent to arouse or gratify any
sexual desire.

On recross, appellant stated that Deputy
Boone, J.R.M., and Roper lied in their testimony, and he described Ranger
Hullum as a Ahired gun@ who said what the
prosecutor wanted him to say.

In assessing whether any error in admitting
Deputy Boone=s and
Ranger Hullum=s
testimony adversely affected the jury=s
decision, we consider the entire record, including the nature of the evidence
supporting the verdict.  Motilla, 78 S.W.3d at 355.  It is undisputed
that appellant slept with J.R.M. and gave J.R.M. back rubs.  J.R.M. testified
that appellant touched J.R.M.=s
penis.  J.R.M. further testified that appellant became aroused many times. 
Appellant admitted grabbing J.R.M.=s
crotch during horseplay.  There is evidence supporting J.R.M.=s testimony and evidence
supporting the verdict.

We also consider the State=s theory, the defensive
theories, and closing arguments.  Id.  Appellant presented evidence that
the allegations against him were related to a custody battle over J.R.M. 
Appellant argued during closing arguments that the Aquestion of custody is important because it
goes to motive.  It goes to bias of witnesses or prejudice of witnesses or
motives of witnesses to testify or influence other people to testify.@  The State=s final argument responds
to appellant=s
theory.  Although the State noted the testimony of Ranger Hullum and Deputy
Boone, the State=s
argument focused on J.R.M. being truthful and the evidence supporting his
testimony.  The State further discussed appellant=s
truthfulness during his testimony.  After reviewing the entire record, we find
that the statements on appellant=s
guilt were harmless and did not affect appellant=s
substantial rights.  Tex. R. App. P.
44.2(b).  We overrule appellant=s
first and second points.

We next consider appellant=s third point in which he
asserts that the trial court reversibly erred when it admitted Ranger Hullum=s testimony about
methodology and grooming.








In the seminal case of Weatherred v.
State, 15 S.W.3d 540 (Tex. Crim. App. 2000), the court instructs that,
under Tex. R. Evid. 702, the
proponent of scientific evidence must show, by clear and convincing proof, that
the evidence being proffered is sufficiently relevant and reliable to assist
the jury in accurately understanding other evidence or in determining a fact
issue.  Id. at 542.  Inasmuch as Ranger Hullum=s testimony does not concern areas in which
precise measurement, calculation, and prediction are generally possible, such
as mathematics, physical science, earth science, and like sciences, it is in
the nature of Asoft@ sciences, which, in
contrast, are generally thought to include such fields as psychology,
economics, political science, anthropology, and sociology.  Id. at 542,
n.5.

The reliability of such Asoft@ science may be established by showing that
(1) the field of expertise is a legitimate one, (2) the subject matter of the
expert=s testimony is
within the scope of that field, and (3) whether the expert=s testimony properly relies
upon and utilizes the principles involved in that field.  Id. at 542. 
An appellate court reviewing a trial court=s
ruling on the admissibility of evidence must utilize an abuse of discretion
standard of review.  Prystash v. State, 3 S.W.3d 522, 527 (Tex. Crim.
App. 1999).  In other words, the appellate court must uphold the trial court=s ruling if it was within
the zone of reasonable disagreement.  Montgomery v. State, 810 S.W.2d
372, 391 (Tex. Crim. App. 1991).  In addition, the appellate court must review
the trial court=s
ruling in light of what was before the trial court at the time of its ruling.  Hoyos
v. State, 982 S.W.2d 419, 422 (Tex. Crim. App. 1998).








In our discussion of appellant=s first two points, we set
out in detail Ranger Hullum=s
training and background, and it is not necessary to repeat them. Suffice it to
say, the qualifications were not only based upon the writings or experiences of
others but also were based upon his own considerable experience.  That training
and experience involved over 3,500 hours in connection with general law
enforcement investigations.  Ranger Hullum had participated in several hundred
cases related to sexual offenses against children, had been the primary
investigator or played a significant role in approximately seventy-five of
those cases, and also had specialized training regarding special offenses or
sexual offenses against children.  That specialized training included topics
such as interviewing child victims, debriefing witnesses involved in such
cases, and interviewing and interrogating suspects involved with sexual
offenses against children.  This type of training, background, and experience
differs considerably from that of the witness found insufficiently qualified in
Perez v. State, 25 S.W.3d 830 (Tex. App.CHouston
[1st Dist.] 2000, no pet.), the case upon which appellant primarily relies in
contending Ranger Hullum was insufficiently qualified.  Under the record before
it at the time the testimony was admitted, we hold the trial court did not
abuse its discretion in admitting the testimony.  Appellant=s third point is overruled.

Because we have overruled all of appellant=s asserted errors, the
judgment of the trial court must be, and is hereby, affirmed.

 

 

PER CURIAM

 

June 3, 2010

Do not publish.  See Tex.
R. App. P. 47.2(b).

Panel
consists of:  Wright, C.J.,

McCall,
J., and Boyd, S.J.[1]









[1]John T. Boyd, Retired Chief Justice, Court of Appeals,
7th District of Texas at Amarillo, sitting by assignment.