**Opinion filed June 3, 2010**



In The

# Eleventh Court of Appeals

_____

**No. 11-08-00069-CR**

_____

**DANIEL RAY MORRIS, Appellant**

**V.**

**STATE OF TEXAS, Appellee**

**On Appeal from the 91st District Court**

**Eastland County, Texas**

**Trial Court Cause No. CR-04-20,480**

**M E M O R A N D U M   O P I N I O N**

This court's former opinion and judgment dated February 25, 2010, are withdrawn, and this court's opinion and judgment dated June 3, 2010, are substituted therefor. On this same date, we overrule Daniel Ray Morris's motion for rehearing.

By presenting three points of asserted error, appellant Daniel Ray Morris challenges his conviction of indecency with a child and the resulting jury-assessed punishment of ten years confinement in the Institutional Division of the Texas Department of Criminal Justice and a fine of $10,000. Imposition of the confinement was suspended, and appellant was placed on community supervision for a period of ten years. In his three points, appellant contends the trial court erred

(1) in allowing a police officer to testify that appellant was guilty, (2) in allowing expert testimony from a Texas Ranger that appellant was guilty and not telling the whole truth, and (3) in allowing Texas Ranger David Hullum to testify as an expert witness about "Methodology" and "Grooming." Disagreeing that reversible error exists, we affirm the judgment of the trial court.

Because they are so closely related, we will discuss appellant's first two points together. In his first point, appellant contends the trial court reversibly erred in permitting a deputy sheriff to testify, over objection, that in his opinion, based upon his training and experience as well as his investigation and the investigation by the other agencies involved, appellant engaged in sexual contact with the victim with the intent to arouse, satisfy, or gratify his sexual desires. In his second point, he complains of the trial court's action in allowing Texas Ranger Hullum to give an affirmative answer to such a question; he places his primary reliance upon the court's decision in *Boyde v. State*, 513 S.W.2d 588 (Tex. Crim. App. 1974). His reliance on *Boyde* requires us to discuss that case in some detail.

The portion of the *Boyde* opinion to which appellant refers is that in which the court refers to a question asked of a State's witness that queried whether the witness knew of any evidence in the case that would tend to exonerate or show that the defendant was not guilty of the offense charged. The defense objection to the question was promptly sustained, and the jury was instructed to disregard it. *Id.* at 590. In considering whether reversal was required, the court noted the general rule that a criminal conviction is seldom reversed because an improper question was asked. However, it went on to emphasize and discuss that the trial record showed the prosecutor asked numerous other questions of a similar nature to which objections were sustained and the jury instructed to disregard. En route to reversing the conviction, the court noted that the prosecutor pursued "a course of repeatedly attempting to place matters before the jury which were clearly impermissible" and which "could have served no purpose other than to inflame and prejudice the minds of the jurors." *Id.* at 593. It chose to explicate the necessity for reversal by stating that "[s]uch prosecutorial misconduct cannot be labeled harmless and requires the reversal of a conviction of a brutal and senseless murder." *Id.* at 593. Thus, the case was reversed because of the totality of the repeated prosecutorial misconduct during the trial, not the mere asking of the guilt opinion questions.

2

In the instant case, however, the objections were not sustained, and the witnesses were allowed to answer. We agree that, in each instance, the questions asked and the answers given may have been tantamount to expressing an opinion as to appellant's guilt. Assuming arguendo that those questions and the answers were improperly given, Texas Rule of Appellate Procedure 44.2(b) requires that we conduct a harm analysis in light of the whole record. TEX. R. APP. P. 44.2(b). In a case such as this one that involves a nonconstitutional error, we disregard such errors unless they affect an appellant's substantial rights. *Rich v. State*, 160 S.W.3d 575, 577 (Tex. Crim. App. 2005). A substantial right is one that has a substantial and injurious effect or influence in determining the jury's verdict. *Id.* A substantial right is not affected by the erroneous admission of evidence if, after examination of the record as a whole, the reviewing court has a fair assurance that the error did not influence the jury or had but a slight effect. *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001). In assessing the likelihood that the jury's decision was adversely affected, the appellate court should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). Our review requires a recitation of relevant evidence in somewhat exhaustive detail.

The State's first witness was J.R.M., appellant's minor stepson and the victim. The first child protective service worker involved in this case was young, female, and attractive, and J.R.M. was reluctant to discuss the incidents with appellant in detail with her. However, he said he was now ready to discuss the incidents before the jury. Appellant first met J.R.M. when he was eleven years old and appellant was dating his mother. J.R.M. thought he had a good relationship with appellant, and they would go to the park, rollerblade, and ride mountain bikes. They would discuss sexual matters, including sex and masturbation. Appellant told J.R.M. that it was "guy talk" between the two of them and that he should not mention it to his mother.

Later, appellant began giving J.R.M. back rubs and would say that his mother had given him back rubs when he was a child. Later, appellant and J.R.M.'s mother married, and appellant continued to give him back rubs. Appellant began to tell J.R.M. that he had concerns about the boy's mother because she would come in late at night and want to have sex and appellant did not want to. Appellant slept in J.R.M.'s bed on those nights when the mother had been drinking, even though

there were other places to sleep such as the living room. J.R.M. said that his mother became concerned about the time that he and appellant were spending together and it made J.R.M. angry.

J.R.M. said that he and appellant would talk just "[s]ex in general, also a lot of times masturbation" and that appellant would ask him questions about his masturbation that embarrassed him. Appellant took him to a show in Abilene entitled "Minority Report," and on the way home, appellant asked him if he had masturbated yet. Appellant also told him that he and his mother's sister, Debra Roper, did not get along and that she thought appellant was gay and was trying to turn J.R.M. gay. J.R.M. overheard appellant and Debra having some kind of discussion. Later, appellant told him that Debra thought appellant spent too much time in his room at night and that he was trying to turn J.R.M. gay.

At some point in time, J.R.M. got a full-size bed, and his mother and appellant would occasionally come in to tuck him in bed. When appellant did so, they would talk about masturbation and sex. Appellant would rub J.R.M.'s back; and, when he did so, he wore briefs or shorts and the back rubs would last fifteen or twenty minutes. Appellant would pull his shorts off and have J.R.M. pull his briefs down so they could have skin-to-skin contact. J.R.M. also said that, in addition to rubbing his back, appellant would also rub his buttocks. At first, appellant would stay thirty minutes to an hour, but, eventually, he would stay the whole night. J.R.M. said he and appellant measured each other's erect penises on one occasion. J.R.M. said that appellant stayed with him "definitely every night" and that appellant would want to cuddle.

J.R.M. described another occasion when his mother caught appellant giving him a back rub as they drove back from a hay trip in appellant's truck. J.R.M. had stripped down to his underwear and was lying with his head in appellant's lap while appellant rubbed J.R.M.'s back with one hand and drove with the other. Appellant had also told him how to find pornography on the internet but told him not to tell his mother or he would get in trouble. When J.R.M. was asked by the prosecutor if he had ever seen appellant aroused during the back rubs, J.R.M. replied that appellant had become aroused many times.

In the month of May 2003, appellant continued to sleep in J.R.M.'s bed and to give and receive back rubs. During those times, appellant would reach inside J.R.M.'s underwear and touch his penis. J.R.M. also testified about a trip he made with appellant to Rainbow, Texas, during which they stayed in an RV trailer. He slept in the master bedroom with appellant, and appellant touched

4

his penis. J.R.M. also read aloud a letter that appellant wrote him after his mother left appellant and took the children. In the letter, appellant told J.R.M. that he was the best son, and he predicted that J.R.M.'s father would try to say that J.R.M. and appellant had a sexual relationship.

Under cross-examination, J.R.M. said that, although he had other friends, he never told any of them about the incidents with appellant. Contrary to his trial testimony that appellant was unclothed and that appellant had touched him in a joking manner, J.R.M. also admitted that, when questioned by the CPS caseworker, he stated that appellant was wearing clothes at the time of all the incidents.

J.R.M.'s mother also testified. She averred that, during her four-year marriage to appellant, they probably had sex only eight or nine times. She was disturbed by the relationship between appellant and J.R.M. She had observed appellant rubbing J.R.M.'s nipple and his inner thigh. J.R.M. had also visited a gay website, and she had overheard appellant tell J.R.M. that he had not been very "lovey dovey." Appellant slept in J.R.M.'s bed increasingly over time. Ultimately, she decided to leave without telling appellant of her decision.

Under cross-examination, she admitted she had been a little concerned that J.R.M. would want to live with appellant after the separation and divorce. Even though she told J.R.M. that she thought something was going on between him and appellant, she allowed him to go on overnight trips with appellant.

Roper was the State's next witness. She opined that J.R.M. was a happy, fun-loving child before her sister married appellant. After that, J.R.M. did not want to have anything to do with her family. She also thought that J.R.M.'s mother changed and lost self-esteem after the marriage. She also referred to a weekend in the fall of 2000 when appellant, J.R.M., and J.R.M.'s mother were staying with the Roper's family. As her sister was taking a shower, Roper walked past the bedroom in which appellant and J.R.M. were lying on the bed; they were both in their underwear. J.R.M. was lying on his back, and appellant was on his side next to J.R.M.'s head rubbing J.R.M.'s thigh.

The State then called Lanny Boone, a deputy sheriff with the Johnson County Sheriff's Office. He began an investigation of the allegations giving rise to this prosecution when J.R.M. was fifteen and appellant was thirty-four. When interviewed by him, he averred, appellant admitted that he had touched J.R.M.'s penis through his clothing and underneath his clothing and that they had skin-to-skin contact. Appellant admitted that J.R.M. had touched appellant's penis but contended

that the touching was not sexual in nature but, rather, was "horseplay." Based upon his training and experience and upon his investigation, Deputy Boone thought that describing the touching as "horseplay" was inconsistent with the facts and that appellant was not "forthcoming" when he made his statement.

The State next called Texas Ranger David Hullum who was director of security for Frac Tech Services. Ranger Hullum had been employed in law enforcement some twenty-nine years, including nine years as a Texas Ranger in the Eastland area. He also had over 3,500 training hours in connection with law enforcement. He had participated in several hundred sexual offense case investigations, at least a third of which involved child victims. He averred that he was the primary investigator or played a significant role in at least seventy-five of those cases. He also had specialized training regarding sexual offenses against children. He was a member of the cold case review committee that investigated unsolved murders and sexual assaults.

Ranger Hullum was queried by the prosecutor as to whether he had reviewed the materials in the underlying case and replied that he had done so. He was then queried whether he had an opinion as to whether appellant had engaged in sexual contact with J.R.M. with the intent to arouse or gratify his sexual desires. Over objection, he opined that appellant had done so. He also opined that, although he himself had engaged in horseplay as a coach, he had never seen any coach or anyone grab another player's crotch or penis. When queried as to why he believed the activity between appellant and J.R.M. was not horseplay, he replied that their activity involved sexual contact, repeated contact, and contact made in secret.

He defined "methodology" as the method of operation or how a particular crime is committed. He defined "grooming" as an attempt to put the victim in a receptive frame of mind to comply with what the offender wants the victim to do. In his opinion, going into a child's bedroom and initially spending ten to fifteen minutes, then finally spending the night, was an example of grooming.

In Ranger Hullum's view, appellant's visits to J.R.M.'s bedroom and the progressive nature of his overnight visits were significant and sufficient to constitute "grooming" or one-on-one intimate time with J.R.M. When appellant gave J.R.M. back rubs, he was desensitizing him by initially touching him in a neutral area where the child did not believe that it was wrong to touch and then progressing to more sensitive areas. Based upon his training, Ranger Hullum said, it was not

6

unusual for a sexually abused child to believe that he or she was being joked with when being touched in a sensitive area. The sexual offender disguises sexual foreplay as "horseplay" in order to obtain sexual contact. Sexual banter and relating prior sexual experiences to a child are also common ways in which to desensitize or "groom" a child. Grooming could also involve measuring a child's penis because it would be another way the offender could justify having his hand in that area of a child's body.

Ranger Hullum also opined that one way sexual offenders would justify their sexual contact with children was to justify it under the guise of sex education. Moreover, he said, a sexual offender discourages family relationships and tries to isolate the child, even to the extent of driving a wedge between a child and his mother. He also opined that male-on-male sexual abuse is the most underreported type because the child is embarrassed and is afraid that he will be perceived as homosexual. Thus, it would not be unusual for a child victim in the eighth grade not to tell his other friends about the abuse.

When cross-examined, Ranger Hullum gave general answers to his qualifications and could not recall the specific titles of his instructors or books or articles that they may have written. He had not actually interviewed appellant but based his opinions on documents that had been produced by the State.

After the State rested, appellant began his presentation by calling Jason Shelton. Shelton was one of J.R.M.'s schoolmates and friends, and he played football with J.R.M. in the ninth grade. He also had hauled hay for appellant after the incident charged in the indictment. In July of 2003, Shelton related, he went to a Future Farmers of America convention with J.R.M. and gave him a letter from appellant that he, Shelton, had read before he gave it to him. J.R.M. had agreed to sell Shelton a four-wheel vehicle but wanted to back out of the agreement after he learned that Shelton was hauling hay for appellant.

Under cross-examination, Shelton said that, when appellant found out about the accusations against appellant, he went to Shelton's house and told him that he had given J.R.M. back rubs and had grabbed J.R.M.'s penis once. Appellant told him that he had purchased pornographic magazines for J.R.M. on the condition that J.R.M. not have sexual relations until he reached a certain age. Appellant also had told the witness that he preferred to sleep with J.R.M. rather than his wife because she was always drunk.

7

Appellant's next witness was Joe Jarvis whose son played football with J.R.M. He averred that he had known appellant for seven years. Jarvis went to the same church as appellant's parents. He thought that appellant had a good reputation, and he would have trusted appellant with his son without qualification.

Brent West, a coach, also testified for appellant. He thought J.R.M. was a great kid and a "pretty good football player." He did not think that J.R.M. had any kind of psychological problems or low self-esteem. As a coach, he said that locker-room horseplay would include players grabbing each other's crotches outside their clothing. He thought appellant was an involved parent.

Bill Sandlin, a junior high and high school principal, testified that he had a business relationship with appellant; they bought and sold hay. He thought that appellant and J.R.M. had a good relationship.

Dennis Milton, the superintendent and mechanical coordinator for Sky High of Fort Worth, testified that he had known appellant since junior high school and that appellant had never shown any kind of sexual interest in anyone other than females. Under cross-examination, he noted that J.R.M.'s mother had been drinking every time he visited. He also said that appellant told him that he left his marital bed because his wife smelled like alcohol and cigarette smoke. He averred that he had told appellant that, if anything happened to him, he would want him to raise his boys. He also averred that appellant had told him that he, appellant, had been accused of, but denied, touching J.R.M.'s penis. Appellant told him that he had rubbed J.R.M.'s sore back after J.R.M. had practiced football.

Darren Wade Morris, appellant's older brother, testified he observed that appellant's wife drank every evening, becoming "pretty well blitzed" by the end of the evening. When they were younger, appellant dated girls, and Darren never knew appellant to be attracted to the male sex. After he was indicted, appellant told him that he slept in J.R.M.'s bed because his wife smelled of alcohol and cigarettes. Appellant did admit to him that he accidently grabbed J.R.M.'s crotch but said that it was during horseplay.

Robert Dunning and Craig Dodson also testified for the defense. Dunning said he had known appellant for about five years and believed that appellant and J.R.M. had a very normal relationship. Dodson, a deputy sheriff for Somervell County, opined that he had known appellant since the sixth

8

grade and that appellant had never shown any inclination toward the male sex. He said that appellant told him he had touched J.R.M.'s genitals but that it was horseplay.

J.R.M. then took the stand. He admitted that in 2005, when interviewed by the district attorney, he spoke about the touching of his genital area but described it as "horseplay." He believed his mother had a drinking problem, and a poem he had written inspired by his mother's problem was admitted into evidence. He denied that he had told anyone that his biological father was going to buy him a jeep for testifying against appellant. He did acknowledge that he had told the CPS worker that he had touched appellant's genitals but that he was not forced to and the contact was a result of horseplay and in a joking manner.

After J.R.M.'s testimony, appellant recalled Shelton who averred that J.R.M. told him his father would buy J.R.M. a jeep if he would testify against appellant.

Appellant then took the stand. He testified that he had met J.R.M.'s mother through a friend and that she introduced him to a nighttime routine of giving her children back rubs when she put them to bed. She eventually asked appellant to assist her in doing so. He had expressed concern to her because she sometimes had allowed J.R.M. and his sister to run around partially clothed. He said he discovered his wife's drinking problem about halfway through their marriage, and he ultimately did not want to sleep with her because she would come in late reeking of beer and cigarettes and wanting to talk and would wake him up. He thought that he and his wife had a regular sexual relationship.

When J.R.M., in a joking manner, asked appellant about his sexual relationship with his wife, appellant said he responded in kind but did not go into detail. J.R.M.'s mother had signed a permission slip for J.R.M. to take sex education at school, but she did not want to talk about it and, instead, asked appellant to do so. Appellant averred that he had tried to do so to the best of his ability. He admitted that he had purchased a Playboy magazine and some others after J.R.M. promised to abstain from sex through high school. He denied that he had purchased any adult videos for J.R.M. although the boy requested him to do so.

Appellant said that their house had settled and that the door to J.R.M.'s room would not close completely. He said that, in the several months before he and J.R.M.'s mother separated, he occasionally slept in J.R.M.'s bedroom because his wife would be drinking and would come into their bedroom during the night and wake him up.

9

Appellant said that, on New Year's Eve of 2000, he and his wife gave a party during which everyone got fairly intoxicated. Roper attended the party. Roper saw him coming out of J.R.M.'s bedroom after he had told J.R.M. good night, and she asked appellant whether what he was doing was "going to turn him." When appellant asked Roper if she was "accusing [him] of turning [his] son gay," he received the reply, "He's not your son." That led to an argument between appellant, his wife, and her sister.

Appellant then described the back rubs that he and his wife gave the children at bedtime. He said that J.R.M. would occasionally rub their backs. He denied ever touching J.R.M.'s testicles, pulling J.R.M.'s underwear down, having J.R.M. touch his penis, or reaching an erection when he gave J.R.M. a back rub. Problems arose during his marriage to J.R.M.'s mother, and J.R.M. said that he would want to live with appellant rather than his father or mother.

Appellant averred that the first time he learned of the allegations against him was in a telephone conversation with his wife after she left him. At that time, she told appellant that he and J.R.M. had an unhealthy relationship. He next received a message from Deputy Boone. Deputy Boone asked him to come in and talk to him because appellant's ex-wife had filed a complaint against him. In the course of the conversation with Deputy Boone, appellant denied touching J.R.M.'s penis but admitted that he might have grabbed the boy's crotch during horseplay. He asserted that he had never been accused of a felony before the instant charges and denied that he had taught J.R.M. how to find free pornographic pages on the internet.

Appellant did remember that his wife had, on one occasion, found some pornographic web sites on the computer and questioned him as to whether he had been looking at them. He denied having done so but said that he had caught J.R.M. using the computer at the time the pornographic material would have been obtained and that J.R.M. had admitted to going to such a web site.

When cross-examined, appellant admitted that J.R.M. slept in his bed most of the nights before they would leave on trips to buy or sell hay. In cross-examining appellant, the prosecutor then used a poster with the elements of the charge against appellant shown on it. Appellant admitted that he had touched J.R.M.'s genitals two or three times but said he only did so as a result of horseplay. When queried by the prosecutor if he was "lovey dovey" with J.R.M., appellant said he did not use that term and did not believe he ever used that term. He said that, when he and J.R.M. engaged in horseplay, they were not in bed. He also averred that, when he and J.R.M. checked into a motel

10

room on their hay trips, they got rooms with full-size beds. He stated that J.R.M.'s allegations of sexual contact were lies and that J.R.M. had had no choice in making them.

On redirect examination by his counsel, appellant denied that his wife had made any complaints about the time he spent with J.R.M. He also denied that he and J.R.M. had ever measured each other's penises although J.R.M. had told him in a joking manner that he had measured his own. He denied that he had ever engaged in secret horseplay with J.R.M. He also testified that, when they engaged in horseplay, he had no intent to arouse or gratify any sexual desire.

On recross, appellant stated that Deputy Boone, J.R.M., and Roper lied in their testimony, and he described Ranger Hullum as a "hired gun" who said what the prosecutor wanted him to say.

In assessing whether any error in admitting Deputy Boone's and Ranger Hullum's testimony adversely affected the jury's decision, we consider the entire record, including the nature of the evidence supporting the verdict. *Motilla*, 78 S.W.3d at 355. It is undisputed that appellant slept with J.R.M. and gave J.R.M. back rubs. J.R.M. testified that appellant touched J.R.M.'s penis. J.R.M. further testified that appellant became aroused many times. Appellant admitted grabbing J.R.M.'s crotch during horseplay. There is evidence supporting J.R.M.'s testimony and evidence supporting the verdict.

We also consider the State's theory, the defensive theories, and closing arguments. *Id.* Appellant presented evidence that the allegations against him were related to a custody battle over J.R.M. Appellant argued during closing arguments that the "question of custody is important because it goes to motive. It goes to bias of witnesses or prejudice of witnesses or motives of witnesses to testify or influence other people to testify." The State's final argument responds to appellant's theory. Although the State noted the testimony of Ranger Hullum and Deputy Boone, the State's argument focused on J.R.M. being truthful and the evidence supporting his testimony. The State further discussed appellant's truthfulness during his testimony. After reviewing the entire record, we find that the statements on appellant's guilt were harmless and did not affect appellant's substantial rights. TEX. R. APP. P. 44.2(b). We overrule appellant's first and second points.

We next consider appellant's third point in which he asserts that the trial court reversibly erred when it admitted Ranger Hullum's testimony about methodology and grooming.

In the seminal case of *Weatherred v. State*, 15 S.W.3d 540 (Tex. Crim. App. 2000), the court instructs that, under TEX. R. EVID. 702, the proponent of scientific evidence must show, by clear and

convincing proof, that the evidence being proffered is sufficiently relevant and reliable to assist the jury in accurately understanding other evidence or in determining a fact issue. *Id.* at 542. Inasmuch as Ranger Hullum's testimony does not concern areas in which precise measurement, calculation, and prediction are generally possible, such as mathematics, physical science, earth science, and like sciences, it is in the nature of "soft" sciences, which, in contrast, are generally thought to include such fields as psychology, economics, political science, anthropology, and sociology. *Id.* at 542, n.5.

The reliability of such "soft" science may be established by showing that (1) the field of expertise is a legitimate one, (2) the subject matter of the expert's testimony is within the scope of that field, and (3) whether the expert's testimony properly relies upon and utilizes the principles involved in that field. *Id.* at 542. An appellate court reviewing a trial court's ruling on the admissibility of evidence must utilize an abuse of discretion standard of review. *Prystash v. State*, 3 S.W.3d 522, 527 (Tex. Crim. App. 1999). In other words, the appellate court must uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991). In addition, the appellate court must review the trial court's ruling in light of what was before the trial court at the time of its ruling. *Hoyos v. State*, 982 S.W.2d 419, 422 (Tex. Crim. App. 1998).

In our discussion of appellant's first two points, we set out in detail Ranger Hullum's training and background, and it is not necessary to repeat them. Suffice it to say, the qualifications were not only based upon the writings or experiences of others but also were based upon his own considerable experience. That training and experience involved over 3,500 hours in connection with general law enforcement investigations. Ranger Hullum had participated in several hundred cases related to sexual offenses against children, had been the primary investigator or played a significant role in approximately seventy-five of those cases, and also had specialized training regarding special offenses or sexual offenses against children. That specialized training included topics such as interviewing child victims, debriefing witnesses involved in such cases, and interviewing and interrogating suspects involved with sexual offenses against children. This type of training, background, and experience differs considerably from that of the witness found insufficiently qualified in *Perez v. State*, 25 S.W.3d 830 (Tex. App.—Houston [1st Dist.] 2000, no pet.), the case upon which appellant primarily relies in contending Ranger Hullum was insufficiently qualified.

Under the record before it at the time the testimony was admitted, we hold the trial court did not abuse its discretion in admitting the testimony. Appellant's third point is overruled.

Because we have overruled all of appellant's asserted errors, the judgment of the trial court must be, and is hereby, affirmed.

PER CURIAM

June 3, 2010

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Boyd, S.J.[1]

---

[1]John T. Boyd, Retired Chief Justice, Court of Appeals, 7th District of Texas at Amarillo, sitting by assignment.