

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00239-CR

_____

ERVIN EDWARD KINGSBURY, III AKA IRVING EDWARD KINGSBURY, III,
Appellant

V.

THE STATE OF TEXAS

On Appeal from the 297th District Court
Tarrant County, Texas
Trial Court No. 1578626R

Before Sudderth, C.J.; Womack and Wallach, JJ.
Opinion by Chief Justice Sudderth

## OPINION

## I. Introduction

Abigail[1] testified that Appellant Ervin Edward Kingsbury III, also known as Irving Edward Kingsbury III, had threatened to kill her while he held a knife in each of his hands—and that he had jabbed at her with one of the knives—during a domestic dispute that arose after he had been drinking alcohol. Abigail, who was pregnant at the time, called 911, as she had on other occasions, and Fort Worth Police Officer Joseph Davis, one of the officers who responded to the 911 call, testified that he spoke at the scene with Abigail and Kingsbury's father, with whom Abigail and Kingsbury lived. After speaking to Abigail and Kingsbury's father and viewing the knives,[2] Officer Davis arrested Kingsbury.

Abigail and Officer Davis testified at trial, and after a Rule 705 hearing, the trial court overruled Kingsbury's objections to SafeHaven CEO Kathryn Jacob's testimony about family violence relationship dynamics. *See* Tex. R. Evid. 705. A jury found Kingsbury guilty of aggravated assault with a deadly weapon and found that he had committed it against Abigail, a member of his household or a person with whom he had a dating relationship (family violence). *See* Tex. Penal Code Ann. § 22.02(a)(2) (stating that a person commits aggravated assault if he commits assault and uses or

---

[1]We use a pseudonym to protect the complainant's privacy.

[2]Officer Davis said that the knives were "considerably larger than paring knives" and that he had "seen homicides committed with knives smaller than that."

2

exhibits a deadly weapon during its commission); Tex. Fam. Code Ann. § 71.0021 (defining dating violence).

Kingsbury's prior judgments of conviction were admitted into evidence during the punishment phase of trial. Two judgments, entered at the same time, showed probation revocation from his having committed another offense, but information about the new offense was redacted. The trial court overruled Kingsbury's complaint that all information about the new offense should be redacted to avoid the jury's speculation about the nature of the redacted offense. The jury assessed Kingsbury's punishment at 55 years' confinement.[3]

In three issues, Kingsburg argues that the trial court erred by admitting the two redacted copies of judgments into evidence, allowing the prosecutor to make an improper jury argument with regard to Kingsbury's father's statements,[4] and allowing the prosecutor to present scientifically unreliable and irrelevant expert testimony through Jacob, who he complains was unqualified. We affirm.

---

[3]Aggravated assault is a second-degree felony, *see* Tex. Penal Code Ann. § 22.02(b), but the punishment range may increase based on prior convictions. Kingsbury's indictment alleged that he was a habitual offender, and the jury found that the prior felony offense allegations were true. *Compare id.* § 12.33 (stating that second-degree felony punishment range is 2 to 20 years and up to a $10,000 fine), *with id.* § 12.42(d) (providing for punishment range of 25–99 years or life if, on trial of a non-state-jail felony, it is shown that the defendant has previously been finally convicted of two felony offenses and the second previous felony conviction is for an offense that occurred subsequent to the first felony conviction's having become final).

[4]Kingsbury's father had dementia and was unavailable to testify.

3

## II. Expert Testimony

In his second issue,[5] Kingsbury contends that the trial court abused its discretion by allowing the State to present Jacob's expert testimony. Under the abuse-of-discretion standard of review, we will uphold the trial court's decision as long as it was within the "zone of reasonable disagreement." *Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018).

### A. Admissibility of Expert Testimony

Rule of Evidence 702 governs the admissibility of expert testimony. Tex. R. Evid. 702. That rule allows a witness who is "qualified as an expert by knowledge, skill, experience, training or education" to "testify in the form of an opinion or otherwise if [her] scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." *Id.* Under Rule 702, three conditions must be met before expert testimony is admissible: (1) the expert must be qualified; (2) the evidence must be reliable; and (3) the evidence must be relevant. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019).

#### 1. Qualification

Qualification is evaluated by a review of the expert's training and experience. *Id.* at 672 n.1. The specialized knowledge that qualifies a witness to offer an expert opinion may be derived from specialized education, practical experience, a study of

---

[5]We begin our review of Kingsbury's appeal with his most complex issue.

technical works, or a combination of these things. *Id.* at 669. The expert's background must be tailored to the specific area of expertise in which she desires to testify, and the proponent of the expert's testimony has the burden to show that the witness is qualified on the matter in question. *Id.* If a witness has a sufficient background in a particular field, then the trial court must then determine whether that background goes to the very matter on which the witness is to give an opinion. *Id.*

To determine whether a trial court has abused its discretion in ruling on an expert's qualifications, we may consider three questions: (1) Is the field of expertise complex? (2) How conclusive is the expert's opinion? and (3) How central is the area of expertise to the lawsuit's resolution? *Id.* at 669–70. An expert does not need to use scientific methods to be qualified, and there is no requirement that the expert's specialized knowledge, training, or experience be based on scientific principles. *Id.* at 670. That is, with regard to qualifications, there is no litmus test, no particular license or degree that an expert must possess to qualify. *Brown v. State*, No. 02-19-00238-CR, 2020 WL 6929846, at *3 (Tex. App.—Fort Worth Nov. 25, 2020, no pet.) (mem. op., not designated for publication).

## 2. Reliability

If the expert is qualified, we consider whether her testimony is reliable by looking at the method she uses to come to her conclusions. *Rhomer*, 569 S.W.3d at 672 n.1.

With regard to reliability, Kingsbury refers us to *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992). Under *Kelly*, for evidence derived from a "hard" science theory to be considered reliable, the underlying scientific theory must be valid; the technique applying the theory must be valid; and the technique must have been properly applied on the occasion in question. *Id.* Facts that could affect the trial court's determination of reliability include the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community; the qualifications of the expert testifying; the existence of literature supporting or rejecting the underlying scientific theory and technique; the potential rate of error of the technique; the availability of other experts to test and evaluate the technique; the clarity with which the underlying scientific theory and technique can be explained to the court; and the experience and skill of the person who applied the technique on the occasion in question. *Id.*

In 1998, the Court of Criminal Appeals acknowledged that, depending on context, the specific "hard" science factors in *Kelly* would not necessarily apply in reviewing the admissibility of "soft" science testimony or would apply with less rigor. *Nenno v. State*, 970 S.W.2d 549, 560–61 (Tex. Crim. App. 1998), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720, 727 (Tex. Crim. App. 1999). "Soft" science describes the social sciences or fields that are based primarily upon experience and training as opposed to the scientific method. *Id.* at 561; *see also Wright v. State*, 618 S.W.3d 887, 891 & n.1 (Tex. App.—Fort Worth Feb. 4, 2021, no pet.) (noting that

6

soft sciences consist of areas involving technical or other specialized knowledge and listing as examples psychology, sociology, and criminology); *Gutierrez v. State*, No. 02-17-00415-CR, 2019 WL 1388748, at *4 (Tex. App.—Fort Worth Mar. 28, 2019, no pet.) (mem. op., not designated for publication) (stating that an expert may compare general or classical behavioral characteristics of a certain type of victim with a specific victim's behavior pattern). To establish the reliability of an expert witness with regard to a "soft" science, the proponent must show that the expert's field of expertise is a legitimate one; that the subject matter of the expert's testimony is within the scope of such field; and that the expert's testimony properly relies upon or utilizes the principles involved in the field. *Rhomer*, 569 S.W.3d at 671.

### 3. Relevance

Finally, to establish relevance—a looser notion than reliability—the expert's testimony must assist the trier of fact and be sufficiently tied to the case's facts. *Tillman v. State*, 354 S.W.3d 425, 438 (Tex. Crim. App. 2011) (explaining that expert testimony regarding principles and theories must "fit" to the facts of the case). Even when the general subject matter is within the average juror's comprehension, a trial court need not exclude expert testimony so long as the witness has some specialized knowledge on the topic that will "assist" the jury. *Id.* at 441 (citing *Coble v. State*, 330 S.W.3d 253, 288 (Tex. Crim. App. 2010)). In other words, the question under Rule 702 is not whether the jurors know something about the subject but whether the expert can expand their understanding in a relevant way. *Id.* Rule 702 only requires

7

that expert testimony meet the simple requirement of being "helpful" to the jury on an issue in dispute, by either validating or calling into question the jurors' own inclinations, including prompting the jurors to reconsider their preconceived notions. *Jordan v. State*, 928 S.W.2d 550, 556 (Tex. Crim. App. 1996). And the relevance, or "fit," of the expert's testimony about principles and theories can be addressed by the expert's discussion of hypotheticals mirroring the case's facts. *Tillman*, 354 S.W.3d at 441.

## B. Domestic Violence

Under certain circumstances, Texas courts have found expert testimony about the dynamics of domestic violence to be admissible under Rule 702. *Brewer v. State*, 370 S.W.3d 471, 474 (Tex. App.—Amarillo 2012, no pet.); *see Nwaiwu v. State*, No. 02-17-00053-CR, 2018 WL 3763899, at *4 (Tex. App.—Fort Worth Aug. 9, 2018, pet. ref'd) (mem. op., not designated for publication) (noting that expert testimony about the effect of domestic violence on victims and the abuser-victim relationship dynamics has generally been held admissible for various reasons).

For example, when a domestic violence victim later recants that the assault occurred, a trial court does not abuse its discretion by allowing the State's domestic violence expert to testify about domestic violence in general and the typical behaviors of victims of such violence. *See Nwaiwu*, 2018 WL 3763899, at *1, *4. In *Nwaiwu*, unrelated bystanders saw the appellant physically assault his girlfriend in public. *Id.* at *1. At trial, the girlfriend both denied that the assault had occurred and said that it

8

had been a mutual struggle. *Id.* The State called a licensed marriage and family therapist who worked with domestic violence victims to explain concepts such as the cycle of violence, the power-and-control wheel, minimization, denial, and assessment of lethality. *Id.* at *2.

On appeal, the appellant argued that the trial court had abused its discretion because the expert's testimony was irrelevant when there was no evidence that the couple had a history of domestic violence, the expert had no personal knowledge of the parties' relationship, and the girlfriend had testified that no assault had occurred. *Id.* at *3. The State replied that the testimony was reliable based on the expert's qualifications and relevant because although the girlfriend had told police who responded at the scene that the appellant had assaulted her, she had testified that he had not. *Id.*

We observed that because the average juror would not typically be familiar with the effect of domestic violence on victims and the dynamics of the abuser-victim relationship, expert testimony has generally been held to be admissible to explain recantations, delays in reporting, lies to the police, and why a complainant would continue to live with a family member after an alleged assault. *Id.* at *3. We noted that multiple courts had held there was no abuse of discretion when an expert was allowed to testify about the cycle of violence in trials in which the victim testified on the defendant's behalf or recanted an earlier claim of abuse and that such testimony

9

was relevant to explain why a victim would change her story about an abusive incident and why she might testify on the alleged abuser's behalf. *Id.* at *3–4.

We also noted generally that no abuse of discretion occurs when an expert witness is allowed to testify about domestic violence in general and the typical behaviors of abuse victims even though the witness has no personal knowledge of the defendant and victim. *Id.* at *3; *see Scugoza v. State*, 949 S.W.2d 360, 363 (Tex. App.—San Antonio 1997, no pet.); *see also Fielder v. State*, 756 S.W.2d 309, 321 (Tex. Crim. App. 1988) ("To the extent that the expert could explain the endurance of the hypothetical woman in a way that the jury could infer it is consistent with a claim of fear of the abuser, that testimony was of 'appreciable aid' to the trier of fact."). We thereby concluded that the trial court had not abused its discretion by allowing the expert to testify about domestic violence in general and the typical behaviors of victims of domestic violence because the testimony was relevant and on a topic with which the average lay person could not be expected to be familiar. *Nwaiwu*, 2018 WL 3763899, at *4.

We further concluded in *Nwaiwu* that to the extent the appellant had challenged the expert's qualifications, the trial court did not abuse its discretion by overruling the appellant's objection to her qualifications because the record reflected her training and experience: she had a master's degree in marriage and family therapy, had worked with approximately 1,500 domestic violence victims over eleven years, had co-authored a family therapy book, had taught university classes on the dynamics of

10

family violence relationships, and had previously testified as a domestic violence expert. *Id.* Although *Nwaiwu* is an unpublished memorandum opinion with no precedential value, *see* Tex. R. App. P. 47.2(b), 47.7(a), we expressly adopt the reasoning therein.

We have also noted that the cycle of violence and power-and-control wheel are generally accepted principles that domestic violence experts use to explain the abuser-victim relationship. *Fernandez v. State*, No. 02-18-00483-CR, 2020 WL 1057323, at *4 (Tex. App.—Fort Worth Mar. 5, 2020, pet. filed) (mem. op., not designated for publication); *see also* Tex. Code Crim. Proc. Ann. art. 38.371(b) (stating that in the prosecution of a family-violence offense, and subject to the Texas Rules of Evidence, "each party may offer testimony or other evidence of all relevant facts and circumstances that would assist the trier of fact in determining whether the actor committed the offense . . . including testimony or evidence regarding the nature of the relationship between the actor and the alleged victim"). Although *Fernandez* is, like *Nwaiwu*, an unpublished memorandum opinion with no precedential value, *see* Tex. R. App. P. 47.2(b), 47.7(a), we expressly adopt its reasoning.

## C. Trial

### 1. Testimony before the Rule 705 hearing

#### a. Abigail's testimony

Abigail testified that she was in court only because she had been ordered to appear and stated that she no longer considered herself to be in a relationship with

Kingsbury. She described their romantic relationship as having begun in February 2015, when she moved into the house that Kingsbury shared with his elderly father. Abigail said that at the beginning, their relationship "was wonderful" and "everything [she] wanted," despite their 30-year age difference. Kingsbury had been self-employed, and she helped him with his work but did not have her own job. Abigail then recounted a few episodes that contradicted the idyll she described.

On January 19, 2016, when Abigail was pregnant with her first child with Kingsbury, she had been at a friend's house when Kingsbury came by "[t]o chill with [her]" but they ended up arguing when he became intoxicated, and they engaged in a physical fight over his wallet. Abigail said that she had taken Kingsbury's wallet "because he wanted to go to the store to get more drinks,"[6] and that he hit her twice in the face with his fist when she would not relinquish it to him. Abigail said that when he hit her, she "hit him back with [her] phone in [her] hand, and he started bleeding." Abigail said, "When he hit me, I just, pow, hit him -- hit him back."[7] Kingsbury left on his own before the police arrived. Abigail said that Kingsbury went to jail on this occasion.

---

[6]Abigail described Kingsbury as becoming verbally aggressive and "smart-mouthing" when he drank alcohol, but she denied that he often drank during their relationship.

[7]Abigail acknowledged her criminal history during her testimony, including a 2012 misdemeanor assault-bodily injury (family violence) conviction, a 2013 misdemeanor theft conviction, and a felony DWI conviction.

Kingsbury's May 23, 2016 judgment of conviction for assault causing bodily injury to a family member (Abigail), a Class A misdemeanor alleged to have occurred on January 19, 2016, was admitted into evidence during another witness's testimony. It showed that Kingsbury had pleaded guilty pursuant to a plea bargain in exchange for 200 days' confinement. The indictment alleged that Kingsbury had hit Abigail and that prior to committing that assault, Kingsbury had been previously convicted of an assault-family violence offense on April 11, 2013.

Sometime after August 2016, when the couple's first child was born, Abigail's mother called the police after Kingsbury pocket-dialed her by accident and she heard the couple arguing and physically fighting. Abigail did not recall what the argument had been about but recalled that she had sustained a busted lip "with the meat hanging," by which she meant skin was hanging off. Abigail had defended herself by hitting him back, and again Kingsbury left before the police arrived. Abigail denied that Kingsbury had started becoming more violent by March 2017, when the instant offense occurred, testifying that she had only called the police between one and three times and that a neighbor had called at least once.

Abigail admitted that Kingsbury occasionally showed jealousy about her "going places" and "[h]anging out with [her] friends." She recalled one occasion when they had argued about her leaving, but she said that she did not think that the police were called on that occasion. Abigail said that he had tried to stop her from leaving once, but although he had made threats, he had tried nothing physical. She stated, "It ain't

13

much to tell about it. I just got in the truck and I left. That's all I remember of that. I don't remember nothing else."

On March 31, 2017, Abigail, Kingsbury, and Kingsbury's father were at home, and Rosalyn, one of Kingsbury's sisters, had come by to talk to Kingsbury about his moving out. Abigail said that the topic had upset Kingsbury and that "[h]e wasn't having it." She also said that Kingsbury had been drinking alcohol that day.[8]

Abigail said that Kingsbury had followed Rosalyn outside to her car and that he was "mostly screaming, yelling" at Rosalyn and then at his father after Rosalyn left. Abigail said that she had been in the bathroom at the time, fixing her hair. After she emerged to check on Kingsbury and was on her way back to the bathroom, he yelled at her, demanding in a loud voice that she shut the window blinds. She refused and explained to the jury that "[h]e was just upset and wanted to fuss at somebody because he couldn't fuss at his sister." Abigail claimed that Kingsbury did not usually make demands of her.

Abigail testified that as she continued on her way back to the bathroom, Kingsbury persisted, asking, "So you're not going to shut my blinds?" He then followed her to the bathroom, where she resumed working on her hair, and he

---

[8]Officer Davis described Kingsbury's red, bloodshot eyes and loud, slurred speech, inability to maintain his balance, and strong odor of alcohol on March 31. Kingsbury passed out at the scene, and when the police checked on him, they "found that he was just uncooperative and would have preferred not to answer questions," and that although they could wake him, he "would then just go back to sleep."

continued to demand, "So you're not going to do it?" After he walked away, she heard him rummaging in the kitchen, and when he came back to the bathroom, he was holding two knives—one in each hand. At that point, he yelled, "Oh, so you're not going to shut my blinds?" and jabbed at her with a knife. He told her, "B-tch, I'll kill you." Abigail said that she believed this threat and became afraid. She managed to shut the bathroom door.

Abigail said that she had been pregnant with their second child at the time and that Kingsbury had known that she was pregnant. As soon as he walked away from the bathroom door, she went into the living room, grabbed the phone, and called 911. The six-minute 911 call was played for the jury, which heard Abigail report that Kingsbury had tried to stab her. Abigail did not recall how long it took the police to arrive or around what time of day the incident occurred. In the parties' kitchen, the police found several knives and took a photo, which was admitted as State's Exhibit 3. Abigail identified two of the knives as the ones Kingsbury had used to threaten her.

The defense subsequently recalled Abigail to ask her whether there had been a pending lawsuit filed by the Texas Department of Family and Protective Services regarding custody of the child she shared with Kingsbury when she had accused Kingsbury of assault on March 31, 2017. Abigail agreed that there had been.

### b. Officer Davis's testimony

Officer Davis, who became a commissioned police officer in 2016, testified that he was undergoing the third phase of his field training in March 2017. He

15

described Abigail's 911 call as having been a priority one call that involved lights and sirens because of immediate threat to life or safety. When he and his field training officer arrived on the scene, two officers had already arrived and detained and handcuffed Kingsbury, secured the residence, and made sure that no one was injured.[9]

Officer Davis's description of what Abigail told the police about the incident at the scene was similar to her testimony at trial:

> Basically, she said that there was a verbal disagreement over something as mundane as the blinds being open, the defendant telling her that she needed to go and close the blinds in a way that she took offense to. She thought that it was disrespectful. So she was in the bathroom. I think she said she was fixing her hair, and after this interaction began to get more and more heated, the volume got turned up on the situation, the defendant grabbed two kitchen knives from the kitchen and told her he was going to kill her. At which point, she shut the door and called for police.

Officer Davis described Abigail's demeanor that night as shaky, evidenced by a quivering voice and visibly trembling hands. According to Officer Davis, she appeared to be "relieved that the police were there to intervene on the situation." He also described the packet used by the police in family-violence investigations, stating, "The family violence packet is a series of roughly a dozen or so pages. It includes our findings on scene, whether we saw visible injury. We are able to describe the demeanor of the suspect if they are still on scene, the demeanor of the victim." The

---

[9]Officer Davis said that in domestic violence situations, which have the potential for physical violence when "emotions tend to be running so high," department protocol was for several officers to be assigned to the call.

16

packet also contains an emergency-protective-order application and a series of 23 questions on the first page "that are meant to identify and analyze the level and extent of violence existing in [a] particular domestic situation" to determine possible escalation into further or more serious violence.

Officer Davis testified that based on Abigail's responses to the danger assessment questions, he "felt that there was an imminent need to separate the parties by arrest." With regard to a protective order, he stated that "[a]nytime an offense is considered to be a felony, which would be in this circumstance because of the exhibition and use of a deadly weapon, [the police] determine that a mandatory protection order is put into place." According to Officer Davis, Abigail had been familiar with the protective order protocol because she had previously filled one out, and "her conduct was consistent with someone who has been familiar with domestic violence."

The police found Kingsbury's father watching television in the back of the house, and, according to Officer Davis, Kingsbury's father corroborated Abigail's version of events. But on cross-examination, Officer Davis acknowledged the possibility that Abigail could have lied and that he had assumed that she was the victim because the police had "had a female caller on the line that said that she was trapped in the bathroom."

## 2. Rule 705 Hearing

After Abigail and Officer Davis testified, the State offered Jacob outside the jury's presence as an expert in the dynamics of family violence, and the trial court held a Rule 705 hearing.

During the Rule 705 hearing, Jacob testified that she had a bachelor's degree and a master's degree in social work and was a licensed master social worker. According to Jacob, she had testified as an expert witness more than 20 times. As SafeHaven's CEO, she had served on its board of directors and had overseen the organization's operations, finances, fundraising, and programs, and she had also held and attended trainings on and made presentations about intimate partner violence. Jacob had attended the Advanced Strangulation Institute on several occasions and had attended Family Justice Center conferences and offender program conferences and trainings. She was a member of the Texas Council on Family Violence, a statewide advocacy and lobbying group, and had been asked by the National Football League to be a critical incident advisor. Jacob stated that SafeHaven serves thousands of domestic violence victims per year.

Jacob testified that she had attended the Duluth training four times and described the Duluth Model, "an evidence-based model out of Duluth, Minnesota[,] that's been around since the 1980s" and used in SafeHaven's 27-week "evidence-based curriculum that teaches [domestic violence] offenders to take violence off the table" and recognizes that violence "is rooted in power and control." The Duluth

18

Model uses "the Power and Control Wheel," which "helps identify how power and control manifest in very specific ways in a relationship" when working with domestic abuse victims.[10] Jacob said that the State's exhibit containing the power-and-control wheel would aid the jury in understanding her testimony.

Jacob offered her testimony "to help the jury understand the dynamics of domestic violence and the Power and Control Wheel and possibly a danger assessment," which she testified is a "tool that SafeHaven, along with many other domestic violence organizations throughout the country, use to measure . . . the possibility of a victim['s] becoming a victim of a homicide at the hands of [his or her] intimate partner." Jacob said that she used the danger assessment, which was created by Dr. Jacquelyn Campbell at Johns Hopkins University School of Nursing in Baltimore in the late 1980s, daily as part of the victim intake-and-assessment process. Jacob stated, "The danger assessment is an evidence-based tool. It's gone through many years of control and variable groups and throughout the scientific process. It is widely used in our field," as well as included in the Tarrant County family violence packet used by law enforcement entities.

The prosecutor asked Jacob, "If I were to tell you that a victim answered in the affirmative to No. 3 . . ., No. 4, No. 5, No. 6, No. 7, No. 8, No. 14, No. 15, No. 18,

---

[10]Another wheel used by the Duluth Model is the "Equality Wheel," which mirrors the power-and-control wheel and shows offenders and victims what a relationship based in equality might look like.

19

how would you score that on a danger assessment?" Jacob replied, "I believe that scores a 22, which would put the score in the extreme danger" level when compared to a relationship of equality, where the score would be zero. She added, "Any score that's over 18 really encourages the victim to . . . take action and seek help immediately." Jacob explained that the victim should answer the questions because the victim "is an expert in her relationship" and that the danger assessment and the risk factors that it includes are helpful in understanding the severity of the intimate-partner violence situation.

Jacob described the cycle of violence as a three-stage cycle with a honeymoon or courtship phase, a tension-building phase, and an incident phase, after which the cycle begins again. Jacob stated, "Most victims can identify with those three stages of the cycle. It -- I have to say that is not an evidence-based tool. It is more anecdotal." She added that it was anecdotal because during focus groups, victims would describe the cycle, and it did not result in measurements.

During defense counsel's cross-examination, Jacob acknowledged that she had never met Abigail or Kingsbury and was not familiar with any of Abigail's accusations. She stated, "We, at SafeHaven, don't believe that it's our role to investigate domestic violence crimes. It's our role to provide service. We believe there are other partners in the system who serve the role as investigator, so that's not something that we do." She also clarified that she was not getting paid for her testimony.

20

During the hearing, defense counsel asked the trial court,

> [C]ould we perhaps remove some of this from discussion until punishment, and that would be the danger assessment, the cycle of violence, the anecdotal evidence, the possibility that a victim will become a homicide victim if harassment -- of the -- of the -- of the abuser, and just concentrate on the other things she talked about? Because those things seem to me to not be relevant for assisting our trier of fact of whether or not a person is guilty as charged.

When the trial court asked for his specific legal objections, defense counsel replied that he was relying on Rule 705 with regard to the admissibility of the opinion because Jacob had admitted that some of it was based on anecdotal evidence and "not the underlying facts or data that are sufficient basis for the opinion as to whether or not Mr. Kingsbury committed this crime as opposed to just sort of generic supposed abusers." At that point, the trial court reminded defense counsel that because Jacob's testimony pertained to the "soft sciences here," the admissibility of her testimony fell "under a different standard."

At the conclusion of the hearing, defense counsel reurged the trial court that Jacob's testimony might help a jury in assessing punishment but not in making a guilt-innocence decision, and he objected based on Rules 702 and 705. Specifically, he complained,

> I don't think she's an expert at all. I think she's a self-created expert in a business that exists to make money off of being a probation provider of services that created -- this organization has created its own criteria, it's

created its own study plan, it's created its own training.[11]   It's chosen from which model they wish to -- to be trained under.

After a brief recess, in response to the prosecutor's argument that relevance went to the nature of the relationship between the defendant and victim and how the victim perceived the incident, the trial judge stated, "Well, I don't know that it shows how she perceived anything, but if it goes to the nature of their relationship, then I'm going to let it in." *See* Tex. Code Crim. Proc. Ann. art. 38.371(b).   The trial court overruled Kingsbury's objection to Jacob's qualifications and his objection that her proposed testimony would not assist the trier of fact to understand the evidence or to determine the fact at issue as to the guilt-innocence phase of trial.

### 3.  Jacob's testimony before the jury

In addition to the facts set out above, Jacob testified to the jury that SafeHaven was a 24/7 business with a 22-member board[12] and a budget of $9 million, and that it had a "robust prevention program that works in dozens of Tarrant County schools preventing issues of domestic violence later in life."   She added that becoming a licensed master social worker required passing a state exam and completing 30 credit

---

[11]During the Rule 705 hearing, Jacob stated that SafeHaven facilitates one of the only accredited programs for offenders in Tarrant County.  Jacob said that about 95% of SafeHaven's offender-clients were referred to the program by a court as part of probation conditions.  She agreed that part of the program "is that the offender pays for the service."

[12]During cross-examination, Jacob acknowledged that there were two Tarrant County district attorneys on the SafeHaven board of directors and that she did not think that there were any criminal defense attorneys.

hours of continuing education every two years. And she elaborated on her invitation to sit as one of the National Football League's critical incident advisors—a group of four individuals called together to provide outside advice to the NFL when a domestic violence incident occurs. Jacob said that she had conducted partner-abuse intervention trainings, she agreed with the prosecutor's characterization that she had "quite a base of knowledge of domestic violence dynamics," and she stated that her expertise was in intimate partner violence.

Jacob explained the three-step cycle of violence and said that the amount of time to go through the phases could vary from an hour to a year and that the cycle could occur multiple times in one day. That is, the parties could be back in the honeymoon phase by the time the police arrived in response to the tension-building and assault phases. Jacob added, "'Victims call the police when they believe that is their last option" for safety.

Jacob explained that the power-and-control wheel is used to describe "some of those characteristics of what an abusive relationship might look like" by SafeHaven and similar domestic and international organizations. Kingsbury then reurged his earlier objections to the admission into evidence of State's Exhibit 6, the Duluth power-and-control wheel. The trial court again overruled those objections. The exhibit showed the spokes of the wheel—covering emotional, physical, and financial abuse—which were "Using Intimidation" (including displaying weapons); "Using Emotional Abuse"; "Using Isolation" (including limiting the victim's outside

23

involvement); "Minimizing, Denying, and Blaming"; "Using Children"; "Using Male Privilege" (including treating the victim like a servant); "Using Economic Abuse"; and "Using Coercion and Threats" (which included making or carrying out threats to do something to hurt the victim).

When asked how pregnancy might play into the power-and-control scenario, Jacob stated that sometimes giving birth prompted the victim to leave the abusive relationship to prevent the child from being abused but that other times domestic violence abusers might use pregnancy to tie the parties together indefinitely as parents to the same child.

Jacob described Dr. Campbell's danger assessment—most recently revalidated in 2018—as 20 yes-or-no questions used to develop a score to evaluate four danger levels. A blank copy of the assessment was admitted into evidence without objection. Some of the questions were weighted, with an affirmative answer receiving additional points. The questions with more weight were:

- Does he own a gun? (4 additional points)

- Have you left him after living together during the past year? (3 additional points)

- Is he unemployed? (3 additional points)

- Has he ever used a weapon against you or threatened you with a lethal weapon? (2 additional points)

- Does he threaten to kill you? (2 additional points)

- Has he avoided being arrested for domestic violence? (2 additional points)

- Do you have a child that is not his? (1 additional point)

- Has he ever forced you to have sex when you did not wish to do so? (1 additional point)

Jacob said that a score of below 8 was a "variable danger level" and the victim would be instructed to trust his or her instincts and watch for signs of danger. A score between 8 and 13 was "increased danger," under which the victim would be advised to understand the risk, have a safety plan, and maintain vigilance. A score of between 14 and 17 was "severe danger" but carried the same instructions as "increased danger." A score of 18 or over was "extreme danger," in which case the victim would be advised to seek action, criminal justice, other help, shelter, and other interventions. According to Jacob, the assessment was supposed to be included as part of the family violence packet when law enforcement investigated a domestic violence incident.

Jacob said that it was more common than not for a victim to fail to realize the severity of her situation and said that some victims become so inured to their situation that they reach a level of apathy. She related that many victims would say, "He told me he would change." She had also heard victims express the belief that they were the cause or trigger of the violence and explained that "[i]t sometimes takes a very long time for a victim to admit that [she is] a victim." Jacob acknowledged that while

alcohol, substance abuse, mental health issues, financial problems, and unemployment could be catalysts or triggers for violent behavior, the cause of domestic violence is "power and control, this one person's need and desire to have power and control over another person."

At the conclusion of the prosecutor's direct examination of Jacob, Kingsbury reurged his objections to her testimony and added that she had "exceeded the scope of admissible evidence." The trial court replied, "Same ruling."

During cross-examination, Jacob agreed that Dr. Campbell, who had developed the danger assessment, was not a licensed professional counselor or social worker but rather a registered nurse and doctor of philosophy. When asked whether the danger assessment had a margin of error for false statements, Jacob replied that she had "not been involved in the research studies . . . to verify the tool" but that they had "gone through control and variable groups and ha[d] been published in several academic journals and journals" in her area of work. She agreed that a victim could lie but admitted that she did not know if the assessment took that possibility into account.

Jacob said that the power-and-control wheel had probably been included each time she had testified over the prior four and a half years and that since its first publication in the 1980s, the economic abuse section had been revised. She agreed that although the power-and-control wheel used the female pronoun to refer to the victim, an abuse victim could be male. When challenged about that and her reference to individual victims as "she," Jacob replied,

[I]n 2010, the Center for Disease Control conducted a prevalence study throughout the United States. That prevalence study showed that the averages among Americans is 1 in 4 women will be affected by domestic violence in her lifetime, 1 in 7 men will be affected by domestic violence in his lifetime. As a response to that, the Texas Council on Family Violence, with other statewide partners, conducted a prevalence study in Texas. The numbers were a little bit different on the female side. The numbers were 1 in 3 women.[13]

## D. Application

Kingsbury argues that Jacob was unqualified to deliver her testimony and that her testimony was scientifically unreliable and irrelevant. The State responds that Jacob was qualified based on her background and experience, that her testimony was reliable because she described the origin of the various teaching and assessment tools and testified that such tools were used throughout the domestic violence field, and that her testimony was relevant because it was directly tied to the case's facts based on the victim's account of her relationship.

### 1. Qualification

With regard to Jacob's qualifications, Kingsbury argues, "It is error for a trial court to permit social workers to offer expert opinions on psychological issues," and refers us to *Perez v. State*, 25 S.W.3d 830, 832, 836, 838 (Tex. App.—Houston [1st Dist.] 2000, no pet.). In that case, the appellant was charged with aggravated sexual assault of a child, and in the State's rebuttal during the guilt-innocence phase of trial,

---

[13]Jacob agreed that those numbers were not reflected in the exhibit, that she was not present when the offense occurred in this case, that she had never met the parties, and that she did not know if there was a victim in the case.

the State called as an expert the director of a nonprofit organization that worked with governmental agencies to evaluate child abuse cases. *Id.* at 831–32. She was allowed to testify about the five stages of "child abuse accommodation syndrome" and to interpret the theories of the pediatric psychiatrist who had identified the syndrome. *Id.*

On appeal, the appellant argued that there had been no scientific basis for the witness's testimony and that the State had failed to demonstrate her qualifications to testify. *Id.* The witness in question had degrees in criminal justice and sociology and was a master social worker, and she had testified that her conclusions were based in part on, and corroborated by, her study of the writings of a pediatric psychiatrist who had published in various professional journals. *Id.* at 832. She also acknowledged that the pediatric psychiatrist in question had agreed that it was not science but rather his opinion regarding similar characteristics shared by children who had been sexually abused. *Id.* at 833. And she stated that her testimony, which she had given as a rebuttal expert for the State ten or twelve times before, "may or may not help" the jury. *Id.* at 836. The court concluded that the trial court had abused its discretion by allowing her to testify as an expert after she had admitted her lack of scientific expertise to render an opinion on the pediatric psychiatrist's theory. *Id.* at 837–38 (noting that although the witness was shown to be an experienced child sexual abuse investigator, "the record contains no evidence demonstrating her ability to interpret and apply psychiatric findings"). The court noted that it "express[ed] no opinion

regarding [her] qualifications to testify as an expert regarding her own observations and opinions, without reference to the opinions, observations, and theories of Dr. Summit." *Id.* at 838 n.2.

Kingsbury argues that Jacob is like the expert in *Perez* in that the honeymoon-tension-incident cycle and danger assessment "serve[] no purpose other than to inflame the jury with pseudo-science." He acknowledges that similar testimony might be admissible to explain recantations, delays in reporting, lies to the police, and why a complainant would continue living with a family member after an alleged assault but argues that none of those facts were present in Kingsbury's case.

We disagree. Here, we do not have "a non-medical witness testifying about findings made about a pediatric psychiatrist" or about any other medical expert's observations or that non-medical witness's interpretations thereof. Instead, we have the testimony of a licensed master social worker who had directly studied intimate partner violence, both the theory and practice.

Jacob had experience in using the tools of that field to educate others about it and to try to prevent tragedies, both on the macro-level by leading an organization dedicated to that pursuit and on the micro-level by acting as, among other things, a consultant to the NFL on critical incidences of domestic violence. She explained the danger assessment, which was introduced to the jury in Officer Davis's testimony, and which was used daily as part of the victim intake-and-assessment process at SafeHaven, and she used the power-and-control wheel and cycle of violence to

explain the dynamics of a relationship characterized by domestic violence, including when a victim might decide to involve the police.

The power-and-control wheel exhibit and Jacob's testimony illustrated aspects of emotional, physical, and financial abuse that could include using intimidation, isolation, and threats; treating the victim like a servant; and manipulating the victim through his or her children. Both the power-and-control wheel and danger assessment have been recognized in case law as helpful to the jury in explaining a domestic violence relationship, and Jacob tied these tools into her own observations and opinions about intimate-partner violence.

Further, Jacob's testimony was admissible to explain Abigail's tolerance of her abusive relationship with Kingsbury when, during her testimony, Abigail appeared to try to minimize the history of domestic violence in her relationship with Kingsbury. That is, Jacob's testimony provided the jury with an explanation why Abigail had lived with Kingsbury for as long as she did and put into context the way that their relationship worked. Accordingly, we conclude that the trial court did not abuse its discretion when it determined that Jacob was qualified, and we overrule this portion of Kingsbury's second issue.

## 2. Reliability

With regard to reliability, Kingsbury refers us to two pre-*Nenno* cases[14] and complains that it is unclear from the record what principles of psychology or psychiatry Jacob might have relied upon to develop her opinions when "[she] did not cite nor rely upon any peer reviewed study or academic journal during her testimony" and "[t]here was absolutely no mention of any methodology nor independent assessments of accuracy" beyond Jacob's testimony that the assessment had been "validated." He complains that Jacob's testimony "was simply presented to boost the credibility of the complainant and to backdoor testimony regarding [his] 'future dangerousness' like the expert in *Coble*."

In *Coble*, the court concluded that expert testimony concerning future dangerousness was insufficiently reliable under Rule 702 because the expert had created his own personal methodology, he did not know of any psychiatric or psychology books or articles that used his factors, and he did not know of any studies regarding the accuracy of long-term predictions into future violence. 330 S.W.3d at 270–72. The court noted that the appellant did not dispute that forensic psychiatry

---

[14]Kingsbury refers us to *Fowler v. State*, 958 S.W.2d 853, 860, 866 (Tex. App.—Waco 1997) (op. on reh'g), *aff'd on other grounds*, 991 S.W.2d 258, 259, 261 (Tex. Crim. App. 1999), and *Forte v. State*, 935 S.W.2d 172, 175–78 (Tex. App.—Fort Worth 1996, pet. ref'd). In *Fowler*, decided the year before *Nenno*, the Waco court held that *Kelly* applied to the soft sciences. 958 S.W.2d at 863–64 ("We believe that if at least some of the *Kelly* factors cannot be satisfied, then the testimony should be excluded."). We likewise decided *Forte* prior to *Nenno* by applying *Kelly* to an expert witness's testimony regarding the reliability of eyewitness testimony. 935 S.W.2d at 175–78 & n.5.

was a science practiced solely by those with a medical degree or contest that the expert's testimony was within the scope of that field; rather, the appellant challenged the third prong of the *Nenno* inquiry, with regard to whether the expert's testimony properly relied upon accepted forensic psychiatry principles. *Id.* at 273–74. The court concluded that based on the record, it could not tell what forensic psychiatry principles the expert might have relied upon because he cited no books, articles, journals, or other forensic psychiatrists who practiced in the area, so there was no objective source material to substantiate his methodology as appropriate. *Id.* at 277–78.

Contrary to Kingsbury's argument, Jacob's testimony was not offered as "hard" science expert testimony. *See Morris v. State*, 361 S.W.3d 649, 654 (Tex. Crim. App. 2011) (explaining that per Rule 702, expert testimony does not have to be based upon science at all). Instead, the trial court applied the *Nenno* standard and could have reasonably determined that Jacob's field of expertise—intimate partner violence—was a legitimate one, *see Fielder*, 756 S.W.2d at 321; that, as set out above, the subject matter of Jacob's testimony was within the scope of that field; and that—as also set out above—Jacob's testimony properly relied upon or used the principles involved in that field. *See Nenno*, 970 S.W.2d at 561; *see also Morris*, 361 S.W.3d at 654. Accordingly, because the trial court could have found Jacob's testimony reliable under the standard applicable to the "soft" sciences, we overrule this portion of his second issue.

### 3. Relevance

With regard to relevance, Kingsbury refers us to four more pre-*Nenno* cases—*Jordan v. State*, 928 S.W.2d 550, 555 (Tex. Crim. App. 1996), *Pierce v. State*, 777 S.W.2d 399, 414–16 (Tex. Crim. App. 1989) (en banc), *Rousseau v. State*, 855 S.W.2d 666, 686 (Tex. Crim. App. 1993) (en banc), and *Williams v. State*, 895 S.W.2d 363, 365–66 (Tex. Crim. App. 1994)—the first three of which pertain to eyewitness identification, which was not an issue in the case. *Cf. Blasdell v. State*, 470 S.W.3d 59, 63 (Tex. Crim. App. 2015) ("Psychology is a soft science, and eyewitness identification is an established subject within the scope of psychology."). *Williams* is also inapposite in that the excluded clinical psychologist had offered the "psychological profile of the type of person who would make harassing telephone calls of a sexual nature" and then his evaluation of the defendant. 895 S.W.2d at 364–65, 366 ("It is not sufficient that the expert merely testify in a conclusory manner . . . that the defendant is not the type of person who would make obscene, threatening telephone calls.").

Kingsbury argues that in Jacob's testimony before the jury, she generally testified to three issues: (1) that abusers in romantic relationships can be controlling; (2) that people in abusive relationships may be in danger; and (3) that people who call the police can be disappointed in the outcome. He asserts that none of these concepts are outside the common sense of an untrained layman and that the State "was unable to make an effort to tie pertinent facts of the case to the scientific principles within the testimony," first and foremost because "there were no scientific

33

principles identified within Jacob's testimony" but also because she was not given hypotheticals relevant to the case and had never met with either of the parties.

The State responds that Jacob's testimony was offered to help explain the abusive relationship between the parties under Code of Criminal Procedure Article 38.371 when the evidence showed that Kingsbury had been violent with Abigail before, that she had continued to live with him even after he had abused her and had been previously convicted of assaulting her, and that she would not have attended the trial but for the court's requiring her to be there. The State further responds that Jacob's testimony related to Kingsbury's behaviors of making threats to Abigail's physical safety and isolating her.

In light of both Abigail's and Officer Davis's testimonies about the events of that evening in March 2017, we think that the trial court could have reasonably determined that Jacob's testimony would be "helpful." Accordingly, we conclude that the trial court did not abuse its discretion by allowing the State to present Jacob's expert testimony, and we overrule the remainder of Kingsbury's second issue.

### III. Jury Argument

In his first issue, Kingsbury argues that the trial court erred by permitting the State to corroborate Abigail's testimony by interjecting facts from outside of the record during guilt-innocence phase closing arguments. Kingsbury directs us to the following portion of the prosecutor's rebuttal:

. . . Officer Davis said on that stand more than one time, multiple times, that the defendant's father's statements to him corroborated what [Abigail] told him. They hadn't spoken. They were separated, and their stories were the same. Their recollection was the same. And he told you how unusual it is to have an independent witness.

[Defense counsel]: Excuse me, I'm going to object as to improper characterization of the testimony and also trying to insert testimony not received from a witness who did not testify, Mr. Kingsbury, Jr., into the case, Your Honor.

THE COURT: *Jury remember the testimony. Go ahead.* [Emphasis added.]

Erroneous jury argument must be preserved by an objection pursued to an adverse ruling. *Hernandez v. State*, 538 S.W.3d 619, 623 (Tex. Crim. App. 2018); *see also* Tex. R. App. P. 33.1(a)(1). "A reminder that the 'jury will recall the evidence' is not an adverse ruling." *Leopard v. State*, 634 S.W.2d 799, 802 (Tex. App.—Fort Worth 1982, no pet.); *see Johnson v. State*, 604 S.W.2d 128, 132 (Tex. Crim. App. [Panel Op.] 1980) (holding that when the trial court merely stated, "The Court has charged the jury on the law with reference to that facet," the appellant had failed to secure a ruling on her objection and thus failed to preserve her jury-argument complaint); *DeRusse v. State*, 579 S.W.2d 224, 235 (Tex. Crim. App. [Panel Op.] 1979) ("The statement by the trial court that the jury would remember the evidence is not sufficient to preserve error; nothing is presented for review.").

Because Kingsbury did not secure an adverse ruling on his objection, he has failed to preserve this complaint for our review. *See Hernandez*, 538 S.W.3d at 622–23. *Compare Bess v. State*, AP-76377, 2013 WL 827479, at *30 (Tex. Crim. App. Mar. 6,

2013) (not designated for publication) (quoting the record in which after the trial court stated, "The jury will recall the evidence the way they see it," in response to defense counsel's objection, defense counsel asked, "Was that overruled?" and secured an express adverse ruling from the trial court), *and Hunt v. State*, No. 02-19-00264-CR, 2020 WL 3987995, at *6 (Tex. App.—Fort Worth June 4, 2020, no pet.) (mem. op., not designated for publication) (quoting the record in which after defense counsel objected and the trial court replied "jury will recall the evidence," defense counsel secured an express adverse ruling by specifically asking for a ruling on the objection), *with Tesi v. State*, No. 02-12-00096-CR, 2014 WL 70084, at *3, *5 (Tex. App.—Fort Worth Jan. 9, 2014, pet. ref'd) (mem. op., not designated for publication) (quoting record in which trial court stated, "Well, the jury will recall the evidence that they've heard" in response to defense counsel's objection and holding that the complaint was not preserved because he received no ruling on his objection). Accordingly, we overrule Kingsbury's first issue.

## IV. Redaction

In his third issue, Kingsbury argues that the trial court erred by permitting redacted copies of judgments in State's Exhibits 14 and 16 during the punishment phase. The State responds that the trial court did not abuse its discretion by redacting the offense when the redaction hid a greater offense (aggravated robbery) than that for which he was actually convicted on the same day as the revocation (robbery with threats) when that robbery-with-threats judgment of conviction was also admitted

36

into evidence. The State further responds that even if the trial court abused its discretion by admitting the redacted judgments, Kingsbury's substantial rights were not affected because of his long criminal history that included previously assaulting Abigail and also threatening to set another woman on fire.

Outside the jury's presence, defense counsel objected that the redaction in State's Exhibits 14 and 16 would lead the jury to speculate as to what offense Kingsbury had committed to have his probation revoked. The jury returned and the State recalled Corporal Carnero, who identified Kingsbury and his CID number and date of birth and identified the judgments of conviction in State's Exhibits 11, 12, 14, 16, 18, 19, 21, 23, and 25 as containing at least one of Kingsbury's identifiers. Defense counsel stood on his prior objections without identifying them before the jury, apparently to prevent drawing attention to the redaction, and the trial court replied, "[s]ame rulings" and admitted the exhibits.

State's Exhibit 14 contains Kingsbury's November 7, 1980 conviction for unauthorized use of a motor vehicle, to which Kingsbury pleaded guilty and was sentenced to 5 years' confinement; the sentence was suspended in favor of 5 years of probation. State's Exhibit 14 also contains the September 7, 1982 judgment revoking Kingsbury's probation for his having "committed another offense against the laws of this State" and for having failed to pay a fine, and it reflects that he was sentenced to 5 years' confinement. The offense upon which revocation was based—aggravated robbery—was redacted.

37

State's Exhibit 16 contains Kingsbury's November 7, 1980 conviction for burglary of a habitation, to which Kingsbury pleaded guilty and was sentenced to 10 years' confinement; the sentence was suspended in favor of 10 years of probation. State's Exhibit 16 also contained the September 7, 1982 judgment revoking Kingsbury's probation for his having "committed another offense" and for having failed to pay his court costs and probation fee, and it reflects that he was sentenced to 10 years' confinement. The offense upon which revocation was based—aggravated robbery—was redacted.

State's Exhibit 18 contains Kingsbury's September 7, 1982 judgment of conviction for robbery with threats to which he pleaded guilty and received 12 years' confinement. State's Exhibit 11, which contains Kingsbury's January 15, 1988 conviction for unauthorized use of a motor vehicle (for which he was sentenced to 40 years' confinement) also references Kingsbury's September 7, 1982 robbery conviction because he pleaded true to the enhancement paragraphs for that conviction (as well as to a May 22, 1981 burglary-of-a-habitation conviction).

We think the jury could "do the math" based on the September 7, 1982 date included in Exhibits 11, 14, 16, and 18. That is, there was sufficient information in the record for the jury to avoid speculating about what offense Kingsbury might have committed in having his probation revoked because he was actually convicted of robbery with threats on the same day as the revocation. Indeed, the redactions benefitted Kingsbury by preventing the jury from learning that his revocation had

38

actually been based on an allegation of aggravated robbery instead of the lesser-included robbery with threats.

However, to the extent that the trial court abused its discretion by allowing the redaction, we agree with the State that any such error was harmless under Rule 44.2(b). *See* Tex. R. App. P. 44.2(b) (requiring the court to disregard any nonconstitutional error that does not affect an appellant's substantial rights); *Haley v. State*, 173 S.W.3d 510, 518 (Tex. Crim. App. 2005) (stating that an error only affects a substantial right when it has a "substantial and injurious effect or influence in determining the jury's verdict").

The remaining exhibits—State's Exhibits 12, 19, 21, 23, and 25, to which Kingsbury raised no objections—contained Kingsbury's May 22, 1981 conviction for burglary of a habitation with intent to commit theft, for which he was sentenced to 5 years' confinement; Kingsbury's June 6, 2012 conviction for evading arrest or detention, a class A misdemeanor for which he was sentenced to 10 days' confinement; Kingsbury's April 11, 2013 conviction for assault-bodily injury of a family member, for which he was sentenced to 100 days' confinement; Kingsbury's April 11, 2013 conviction for resisting arrest, for which he was sentenced to 100 days' confinement; and docket information on Kingsbury's convictions for terroristic threat and deadly conduct, for which he was sentenced to 180 days' confinement and a year's confinement, respectively. The terroristic threat and deadly conduct indictment alleged that Kingsbury had used a flame or flammable liquid to place Doris Kingsbury

in fear of imminent serious bodily injury and that he had recklessly engaged in deadly conduct by attempting to spray Doris with flammable liquid and by attempting ignition in close proximity thereto.

The State reserved its closing argument on punishment, allowing defense counsel to argue first. Defense counsel argued that the jury had to consider whether to sentence the 65-year-old defendant to die in prison. The prosecutor responded that the convictions in State's Exhibits 11, 12, and 18—to which Kingsbury raised no objections—supported the habitual offender paragraphs in the indictment, increasing Kingsbury's punishment range to 25 years to life. She argued that Kingsbury was a career criminal who had "made it his job to create victims" and had left a trail of violence, including that he had tried "to light Doris Kingsbury on fire,"[15] in addition

---

[15]One of our sister courts reviewed that case on appeal, and its factual recitation states,

> On October 17, 1998, Kingsbury arrived home around 11:00 p.m. and asked his wife, Doris, where she had placed his guns. He explained to her that he needed the guns to shoot some people who had stolen his spark plug wires. Doris stated that she did not know about any guns, and Kingsbury became angry. He poured gasoline into a bug sprayer, got a propane bottle, and told Doris that he was going to "burn [her] ass up." He pumped the sprayer with the nozzle close to Doris' face and tried to ignite it with a cigarette lighter, but it did not work. Doris ran outside and then returned inside, called her sister, then called 9–1–1. Kingsbury poured gasoline around the house, telling Doris that he was going to "burn this M.F. house up with [her] in it," and tried to light some newspapers on the porch, but could not get them to ignite. When the police arrived, they ordered Kingsbury to put down the cigarette lighter and the bug sprayer, but he refused. The officers had to

to jabbing a knife at Abigail when she was pregnant. She warned the jurors that Kingsbury had thrived on power and control in every relationship. She told the jury that Kingsbury had had the opportunity to learn from his prior convictions but that he was not going to learn.

The redactions in the two exhibits that Kingsbury complains about on appeal—State's Exhibits 14 and 16—prevented the jury from seeing a greater offense rather than the one for which Kingsbury had actually been convicted, which was admitted into evidence. Based on our review of the record as a whole, *see Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002), and in light of the remaining evidence and both parties' avoiding emphasizing the redaction, we conclude that Kingsbury's substantial rights were not affected, and we overrule his remaining issue. *See id.*

## V. Conclusion

Having overruled all of Kingsbury's issues, we affirm the trial court's judgment.

/s/ Bonnie Sudderth
Bonnie Sudderth
Chief Justice

---

forcefully stop Kingsbury. At the officers' direction, Doris threw the "hissing" propane bottle into the street.

*Kingsbury v. State*, 14 S.W.3d 405, 406–07 (Tex. App.—Waco 2000, no pet.). However, during the punishment phase in the instant case, the State did not go into the details beyond what was mentioned in the terroristic threat and deadly conduct indictment.

Publish

Delivered: June 10, 2021